UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| NEIL and KRISTINE MARKEY,<br>individually, and on behalf of all others<br>similarly situated, | :<br>:<br>:<br>: |
| *Plaintiffs,* | :    Civil Action No. 2:12-cv-04622(JS)(AKT)<br>: |
| v. | :<br>: |
| LAPOLLA INDUSTRIES, INC., a Delaware<br>Corporation, LAPOLLA INTERNATIONAL, INC.,<br>a Delaware corporation, and DELFINO<br>INSULATION COMPANY, INC., a New York<br>Corporation, | :<br>:<br>:<br>:<br>: |
| *Defendants.* | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### DEFENDANT LAPOLLA INDUSTRIES, INC.'S
### MEMORANDUM OF LAW IN SUPPORT OF
### <u>MOTION FOR SANCTIONS</u>

Defendant Lapolla Industries, Inc. ("Lapolla") hereby submits this Memorandum of Law in

Support of Motion for Sanctions, and would show the Court as follows:

Respectfully Submitted,

By: <u>/s/ Dylan B. Russell</u>
Matthew A. Kornhauser
Texas SBN: 11684500
Dylan B. Russell
Texas SBN: 24041839
HOOVER SLOVACEK LLP
5847 San Felipe, Suite 2200
Houston, Texas 77057
russell@hooverslovacek.com
Tel:  (713) 977-8686
Fax: (713) 977-5395

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii-v

I.      Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I. 1

        A.      Lapolla seeks to recover its legal fees and costs after the Markeys decide to
                voluntarily dismiss their frivolous claims, with prejudice, after almost two years of
                litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        B.      Discovery on the merits only started in earnest after the Markeys and their former
                counsel failed to obtain MDL centralization and then withdrew their class action
                allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        C.      The Markeys' former counsel withdrew from the case shortly after Lapolla
                discovered that the Markeys and their former counsel failed to produce numerous
                email communications regarding an air testing report, which had not been produced
                under rule 26(a), stating that the SPF "should not negatively impact the health of
                anyone" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        D.      The Markeys and their former counsel continued to assert that both of the Markeys
                suffered personal injuries caused by Lapolla's SPF even though Mrs. Markey's
                doctors found the opposite and even though there was no evidence showing Mr.
                Markey had suffered any personal injury at all . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.  Legal Bases for Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.      Rule 26 and Rule 37 sanctions against the Markeys and Morelli Alters Ratner are
                warranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.      28 U.S.C. § 1927 sanctions against Morelli Alters Ratner are warranted . . . . . . 27

        C.      Sanctions against the Markeys and Morelli Alters Ratner under the court's inherent
                power are warranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

III.  Relief Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## INDEX OF AUTHORITIES

**Cases:**                                                                    **Page No.**

*Cabana v. Forcier*, 200 F.R.D. 9, 2001 U.S. Dist. LEXIS 8495 (D. Mass. 2001) . . . . . . . . . . 21

*Chanin v. Eastern Vir. Med. Sch.*, 459 S.E.2d 523 (Va. Ct. App. 1995) . . . . . . . . . . . . . . . . . . 20

*Chriestenson v. Russell Stover Candies*, 263 P.3d 821 (Kan. Ct. App. 2011) . . . . . . . . . . . . . 21

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Dahiya v. Kramer*, No. 13-CV-3079, 2014 U.S. Dist. LEXIS 41425, 2014 WL 1278131 (E.D.N.Y. March 27, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Enmon v. Prospect Capital Corp.*, 675 F.3d 138 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 28

*Freeman v. Schointuck*, 192 F.R.D. 187, 188, 2000 U.S. Dist. LEXIS 11188 (D. Md. 2000) . . 21

*In re Fosamax Prods. Liab. Litig.*, No. 06 MD 1789 (JFK), 2012 U.S. Dist. LEXIS 166734 (S.D.N.Y. Nov. 20, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re September 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114 (S.D.N.Y. 2007) . . . . . . . . . 25

*In re Vioxx Prods. Liab. Litig.*, 557 F. Supp. 2d 741 (E.D. La. 2008) . . . . . . . . . . . . . . . . . . . . 17

*Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . 29

*Keller v. Mobil Corp.*, 55 F.3d 94 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*KGK Jewelry LLC v. ESDNetwork*, No. 11 Civ. 9236, 2014 U.S. Dist. LEXIS 38630, 2014 WL 1199326 (S.D.N.Y. March 21, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Kosher Sports Inc., v. Queens Ballpark Co., LLC.*, No. 10-CV-2618, 2011 U.S. Dist. LEXIS 86651 (E.D.N.Y. Aug. 11, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lapolla Indus., Inc. v. Aspen Specialty Ins. Co.*, 962 F. Supp. 2d 479 (E.D.N.Y. 2013) . . . . . . 1

*Lapolla Indus., Inc. v. Aspen Specialty Ins. Co.*, No. 13-4436-CV, 2014 U.S. App. LEXIS 9199 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Latouche v. N. Country Union High Sch.*, State Vermont Dept. Lab. & Indus., Opinion No. 58-98WC (Oct. 19, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lodge v. United Homes, LLC*, 787 F. Supp. 2d 247 (E.D.N.Y. 2011) . . . . . . . . . . . . . . . . . 25, 26

*Mason v. Home Depot U.S.A., Inc.*, 658 S.E.2d 603 (Ga. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 21

*McCune v. Rugged Entertainment, LLC*, No. 08 CV 2677, 2010 U.S. Dist. LEXIS 30102, 2010 WL 1189390 (E.D.N.Y. March 29, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Minner v. American Mortg. & Guar. Co.*, 791 A.2d 826 (Del. Super. 2000) . . . . . . . . . . . 20, 23

*National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976) . . . . . . . . . 25

*Nieves v. City of New York*, 208 F.R.D. 531 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002) . . . . . . . . . . . 25

*Rofail v. United States*, 227 F.R.D. 53 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323 (2d Cir. 1999) . . . . . . . . . . . . . . . . 27

*Taft v. Blue Mountain Union Sch.*, State Vermont Dept. Lab. & Indus., Opinion No. 10-99WC (Mar. 24, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205 (E.D. Tenn. 2000) . . . . . . . . . . 21

*Yang v. E.I. du Pont de Nemours & Co.*, No. Civ.A.04A-01-0008 MMJ, 2004 Del. Super. LEXIS 408 (Del. Super. 2004), *affirmed* 877 A.2d 53 (De. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Statutes:**

28 U.S.C. § 1927 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

28 U.S.C. § 1407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Rules:**

FED. R. CIV. P. 26(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

FED. R. CIV. P. 26(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FED. R. CIV. P. 26(g)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

FED. R. CIV. P. 37(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

FED. R. CIV. P. 37(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# I. Factual Background

**A.     Lapolla seeks to recover its legal fees and costs after the Markeys decide to voluntarily dismiss their frivolous claims, with prejudice, after almost two years of litigation.**

1.      Lapolla has been diligently defending itself from the claims asserted by the Plaintiffs Neil and Kristine Markey (the "Markeys") since September 2012 and has incurred significant time, money, and effort in furtherance of that defense.  In fact, Lapolla was initially denied insurance defense coverage from one its insurers, only to have one of them later agree to provide coverage under reservation of rights, forcing Lapolla to enter into long drawn-out negotiations with the insurance company to reimburse it for fees and costs it had incurred through its then chosen counsel. Lapolla ended up having to absorb a significant portion of those fees and costs in light of the stance taken by the insurer.  Then, shortly after the Markeys' latest amended pleading, the insurer that previously defended Lapolla withdrew coverage and then filed suit against Lapolla seeking a declaration that it had no duty to defend.[1]  Since that time, Lapolla has been forced to defend itself with its own resources.  Lapolla is currently in litigation with one of the insurers, one that has always declined to provide coverage.[2]

2.      From its inception, Lapolla firmly believed that the Markeys' claims were frivolous and were only designed to force Lapolla to pay a cost-of-defense settlement or otherwise have to defend itself on the merits at significant cost.  Unfortunately, it took almost two years of litigation

---

[1] *Evanston Ins. Co. v. Lapolla Indus. Inc.*, Case No. 4:14-cv-00654, in the Southern District of Texas.

[2] *Lapolla Indus., Inc. v. Aspen Specialty Ins. Co.*, 962 F. Supp. 2d 479 (E.D.N.Y. 2013) (dismissing Lapolla's declaratory judgment seeking defense coverage); *see also Lapolla Indus., Inc. v. Aspen Specialty Ins. Co.*, No. 13-4436-CV, 2014 U.S. App. LEXIS 9199 (2d Cir. 2014) (affirming trial court's ruling but currently considering pending motion for rehearing and rehearing en banc).

before Lapolla's belief was confirmed when the Markeys moved to dismiss their case and abandon their claims with prejudice.  The true prejudice, however, has been suffered by Lapolla.

3.      Early on in the litigation, Lapolla had to defend against the Markeys' attempt to have their case consolidated into a nation-wide multidistrict ligation ("MDL") proceeding with other spray polyurethane foam ("SPF") cases, involving different manufacturers of foam, some of which were also brought by the same attorneys who represent the Markeys in this case.  *See* **Exhibit 2**. When the effort to centralize this case into an MDL proceeding failed, Lapolla then was forced to defend against the Markeys' class action allegations.  When the Markeys' gave up their class action allegations, over a year after the lawsuit was filed, Lapolla was then forced to conduct discovery relating to the Markeys' underlying allegations, which suggested that both of the Markeys had suffered personal injuries from Lapolla's SPF product.

4.      In furtherance of its defense of the Markeys' personal injury claims, Lapolla discovered—almost exclusively through documents produced in response to non-party subpoenas to the Markeys' physicians and air testing consultants—that the Markeys had no evidence that they actually suffered any personal injuries at all or any injuries any caused by Lapolla's SPF.  In fact, as to Mrs. Markey, her own doctors' medical records indicated that Mrs. Markey suffered no injuries from the SPF, despite her personal belief to the contrary.  Mr. Markey's medical records were completely silent on any injuries at all related to the SPF.

5.      As a result of the dearth of any evidence of personal injuries, the Markeys were ordered to produce some medical evidence showing that they had actually suffered personal injuries resulting from Lapolla's SPF, since the Markeys' admitted, over a year into the case, that they had no such medical evidence.  The Markeys failed to comply with the court's initial deadline to produce

such evidence.  Only after being given an month and a half extension, did the Markeys produce a report (dated a month before the original deadline) purporting to suggest Mrs. Markey had suffered some injuries from the SPF.

6.      On the eve of the Markeys' depositions, apparently in light of previously undisclosed documents and communications recently procured from one of the Markeys' air testing consultants, the Markeys' counsel unilaterally cancelled the depositions and moved to withdraw from the case, all the while hiding behind the attorney-client privilege in an effort to avoid having to explain to the Court the reason numerous key documents and communications had been withheld and/or destroyed by the Markeys and/or their attorneys for well over a year.

7.      Then, shortly after hiring a new attorney, the Markeys now request that the Court permit them to dismiss their claims with prejudice, and, most significantly, without "costs to the defendants."

8.      To let the Markeys and their former attorneys out of this financial fiasco without any redress to Lapolla would be unconscionable.  Vexatious litigants like the Markeys and their counsel should not be able to use and then abuse the legal system, costing significant time, labor, and expense to Lapolla even beyond the defense of this particular case, while unnecessarily using precious judicial resources, only to dismiss their action almost two years after being filed, scot-free.

9.      As such, Lapolla respectfully asks this Court to enter an order finding the Markeys and their former counsel jointly and severally liable to Lapolla for the legal fees and costs incurred by Lapolla in defending this case.

**B.      Discovery on the merits only started in earnest after the Markeys and their former counsel failed to obtain MDL centralization and then withdrew their class action allegations.**

10.      This case was filed by the Markeys on September 14, 2012 and was couched as a class action.  *See* **Exhibit 1**.   The Markey's initial complaint centered on allegations that both of the Markeys suffered personal injuries, in addition to property damages, as a result of the installation of one of Lapolla's SPF products into a new addition of their home while it was still under construction in early March 2012.

11.      The Markeys hired Defendant Delfino Insulation Company, Inc. ("Delfino") to install the SPF.   Delfino purchased the SPF from a distributor, Third-Party Defendant Energy Independence, Inc. d/b/a Spray Foam Nation, who had previously purchased the SPF from Lapolla. Lapolla does not provide installation services nor does Lapolla generally sell its products to end-users, particularly homeowners. As such, Lapolla was not involved in the Markeys' home addition project.  Lapolla was only made aware of their complaints about the SPF after it was installed by Delfino.

12.      The Markeys' counsel in the original complaint included the following firms and attorneys (hereinafter "Morelli Alters Ratner"): Morelli Ratner PC (with attorneys Benedict P. Morelli, David S. Ratner, and David T. Sirotkin); Alters Law Firm, P.A. (with attorneys David C. Rash, Jeremy W. Alters, and Matthew T. Moore); and the Law Offices of Wolf & Pravato (with attorney Vincent J. Pravato).

13.      On February 27, 2013, the same group of attorneys that represented the Markeys in this case, Morelli Alters Ratner, filed with the Judicial Panel of Multidistrict Litigation ("JPML") a Motion for Transfer of Actions pursuant to 28 U.S.C. § 1407 in *In re Spray Polyurethane Foam*

*Insulation Litigation*, MDL No. 2444, which sought to centralize the Markeys' lawsuit along with a number of other cases involving similar allegations, including another lawsuit against Lapolla as well as lawsuits against different manufacturers of similar spray polyurethane foam products.  *See* **Exhibit 2**.  The counsel on behalf of the movant (Renzi), with whom the Markeys joined, in the Motion for Transfer of Actions included the following firms and attorneys: Morelli Alters Ratner PC (with attorneys David C. Rash, Jeremy W. Alters, Matthew T. Moore, Benedict P. Morelli, David S. Ratner, and David T. Sirotkin); and the Law Offices of Wolf & Pravato (with attorney Vincent J. Pravato).

14.     On April 17, 2013, while the motion before the JPML was pending, the parties in this case filed their Joint Discovery/Case Management Plan, after much negotiations and discussion on how to best schedule and coordinate both the class action discovery and merits-based discovery. The initial conference was held on April 18, 2013.  The court stayed discovery in light of the motion pending before the JPML despite opposition from Defendants but ordered that "the parties shall exchange Rule 26(a)(1) disclosures . . . notwithstanding the stay of discovery."  *See* **Exhibit 3**.

15.     On May 3, 2013, the Markeys, through their lead law firm, Morelli Alters Ratner PC, served their Plaintiffs' Rule 26 Initial Disclosures on the defendants.  *See* **Exhibit 4**.

16.     On May 21, 2013, the court continued the stay while the JPML had the Motion for Transfer of Actions under consideration.  *See* **Exhibit 5**.

17.     After oral arguments by Lapolla's counsel and other manufacturers' counsel before the JPML in Louisville, Kentucky on May 30, 2013, the Motion for Transfer of Actions was denied on June 6, 2013.  *See* **Exhibit 6**.

18.     On June 11, 2013, the court lifted the discovery stay in light of the ruling by the JPML and ordered the parties to a file a revised proposed discovery plan by June 19, 2013.  *See* **Exhibit 7**.

19.     On June 26, 2013, the court entered a new scheduling order, permitting the parties to conduct primarily class action discovery but permitting the parties to also simultaneously conduct merits-based discovery.  *See* **Exhibit 8**.  Thereafter, the parties served on each other discovery related to both class action allegations as well as discovery related specifically to the Markeys' personal injury and property damage allegations.  Additionally, Lapolla began serving subpoenas on non-parties, including to the Markeys' physicians, only after Lapolla obtained HIPAA releases from the Markeys, and the Markeys' various air quality and air testing consultants.

**C.     The Markeys' former counsel withdrew from the case shortly after Lapolla discovered that the Markeys and their former counsel failed to produce numerous email communications regarding an air testing report, which had not been produced under rule 26(a), stating that the SPF "should not negatively impact the health of anyone."**

20.     As a primary factual allegation, the Markeys alleged that the SPF "off-gassed" various chemicals, including volatile organic compounds (VOCs), and that such chemicals caused the Markeys' personal injuries.  More specifically, the Markeys alleged that air tests had been performed at their home revealing the presence of chemicals indicative of those believed to off-gas from Lapolla's SPF, as follows: "Testing of the air done at Plaintiffs' home after the SPF installation has indicated the presence of Chlorinated Tris" and "elevated levels of VOCs including Ether, Ethanediamine, and Acetaldehyde." *See, e.g.,* Original Complaint, at p. 6, ¶¶ 18-19.  Thus, the air tests provided an initial link in the causal chain in order for the Markeys to be able to assert (with

some factual basis) that there was some relationship between the chemicals allegedly found in the air in their home and the chemicals allegedly off-gassed from Lapolla's SPF.

21.     On this point, in their initial disclosures served on May 3, 2013, the Markeys produced a report that was described as a "May 25, 2012 report from Insight Environmental and related air testing results." The report was dated May 25, 2012 and signed by George Maul with Insight Environmental.  *See* **Exhibit 9**. Importantly, the May 25, 2012 report produced with the disclosures provided, in pertinent part, as follows:

> Regulated compounds detected above laboratory reporting limits are within established OSHA permissible exposure limits (PELs), the American Conference of Governmental Industrial Hygienists (ACGIH) threshold limit values (TLVs) and the National Institute for Occupational Safety and Health (NIOSH) recommended exposure limits (RELs).

> It is noted that many of the compounds detected do not have dose response related exposure limits as established by OSHA, NIOSH or the ACGIH due to the lack, of epidemiological data and as such are un-regulated.

> We find it likely that concentrations during initial application and the ensuing 24-48 hours were substantially higher than those observed in the sampling battery discussed herein. These elevated concentrations are most attributable to your reported discomfort while taking occupancy within the home and the lingering odor. Furthermore, this exposure may have resulted in a chemical sensitivity where even a minute amount of the odor now will initiate a neurological response resulting in additional discomfort.

> To aid in the removal of residual odor associated with off-gassing during the curing process, we recommend that additional ventilation be added to the newly built portion of the dwelling. We also recommend the use of air purifiers with activated charcoal carbon filters to scrub the air and neutralize the odor throughout the problem areas. Additional door neutralizers may be used in concert with the air purifiers.

*See* **Exhibit 9**.   Thus, on its face, the report purported to suggest a causal link between the "compounds" and the Markeys' alleged "discomfort," "chemical sensitivity," and "neurological response."

22.     On August 22, 2013, the Markeys made their first production of documents in response to Lapolla's Request for Production, which was served on July 23 ,2013.  The production included 120 pages of documents, labeled PL_00001 to PL_00120.  *See* **Exhibit 10**.  Significantly, no additional documents created by or involving Insight Environmental were produced at that time, nor were any communications between the Markeys and Insight Environmental produced.

23.     What was produced, however, were communications referencing George Maul and a report of Insight Environmental.  Specifically, the documents produced included communications by Mrs. Markey and Delfino to the Suffolk County Department of Consumer Affairs relating to an administrative complaint initiated by Mrs. Markey.  *See* **Exhibit 10**.

24.     On May 17, 2012, Mrs. Markey submitted a complaint to the Department of Consumer Affairs alleging that they "had an indoor air quality test done and it came back with elevated levels of chemicals consistent with open cell spray foam" and that the "air quality engineer advised us that these chemicals prove the spray foam insulation did not fully cure and is off-gassing." *See* **Exhibit 10**, at PL_00005-00006.

25.     On August 2, 2012, in response to the complaint, Delfino wrote to the Department of Consumer Affairs asserting that "[d]uring our conversation, Mr. Maul [of Insight Environmental] informed me that his written report was mailed out to the Markey's [sic] and that it revealed that there were no health risks."  *See* **Exhibit 10**, at PL_00007-00008.

26.     On August 19, 2012, the Markeys replied asserting, as follows:

> Mr. Delfino also stated that upon speaking with George Maul, that he had said there were no health risks. This is not what we have in our written report by Insight Environmental which we have not submitted by advisement of our attorney.

*See* **Exhibit 10**, at PL_00009-00010. Thus, from these communications, it appeared there was some conflicting representations about what the Insight Environmental report by George Maul stated regarding health risks.

27.     Mrs. Markey's letter also revealed that the Markeys were receiving legal advice from an attorney less than a month before the original complaint was filed in this Court. The August 19, 2012 reply by Mrs. Markey discussing her attorney's advice about the report was less than a month before the Markeys first filed suit on September 14, 2012. Most concerning, the attorney's legal advice was to not reveal or produce the Insight Environmental report, which is precisely what happened after the Markeys initiated litigation. These communications only suggested to Lapolla that the report (just the one known report) referenced by Mrs. Markey must have been the one report produced with the Markeys' initial disclosures in May 2013.

28.     A year later, on September 16, 2013, Lapolla served a subpoena on Insight Environmental to produce all relevant communications and documents. *See* **Exhibit 11**. Insight Environmental responded by producing about thirty pages of communications and documents. *See* **Exhibit 12**. The documents were served on all parties, including the Markeys' lead counsel, Morelli Alters Ratner PC, on October 7, 2013.

29.     Included in the production was another report from Insight Environmental, also dated May 25, 2012, signed by George Maul. Although the report produced in response to the subpoena was mostly similar to the report previously produced in the Plaintiff's disclosures in May of 2013,

the version produced by Insight Environmental included several key paragraphs that were completely different from those provided in the previously produced report, as follows:

> It should be noted that all of the **compounds found to be present** above the reporting limits **are well below** OSHA's permissible exposure limits (PELs), the American Conference of Governmental Industrial Hygienists (ACGIH) and the National Institute for Occupational Safety and Health (NISOH) recommended exposure limits (RELs).
>
> **Based on these findings, the odor present appears to be a nuisance odor and should not negatively impact the health of anyone occupying the area.** To aid in the removal of residual odor associated with off-gassing during the curing process, we recommend that additional ventilation be added to the newly built portion of the dwelling. We also recommend the use of air purifiers with activated charcoal carbon filters to scrub the air and neutralize the odor throughout the problem areas. Additional door neutralizers may be used in concert with the air purifiers.

*See* **Exhibit 12** (emphasis added).

30.     From this point, it became clear that an alternate version of the May 25, 2012 Insight Enviromental report—one very damaging to the Markeys' case, if not dispositive—existed and yet was never produced by the Markeys or Morelli Alters Ratner PC, either in the initial disclosures or in response to Lapolla's request for production or a supplement thereto.

31.     Despite having been provided the alternate version of the May 25, 2012 Insight Environmental report, the Markeys themselves never produced that version of the report nor did they ever supplement their production of documents and disclosure to include any emails that might have existed between the Markeys and Insight Environmental relating to either version of the report.

32.     After that point, and in light of the reports and the medical records of the Markeys, Lapolla began to seriously question the viability of the Markeys' personal injury claims.  Ultimately, the Court compelled the Markeys to produce some medical evidence by mid-January 2014 that tied any personal injuries to Lapolla's SPF, as discussed in more detail below.  *See* **Exhibit 13**.

33.     Between November 2013 and March 2014, the parties delayed discovery efforts including depositions until the Markeys could produce the medical evidence as ordered by the court. The parties proceeded with an early February 2014 inspection of the Markeys' home, attended by all parties' experts, even though the Markeys did not produce a medical report until early March after failing to miss the court's initial deadline.  Thereafter, the parties began efforts to coordinate deposition schedules for fact witnesses and parties, which would then be proceeded by expert depositions.

34.     Ultimately, Lapolla took the deposition of George Maul of Insight Environmental on April 23, 2014.  On the day of the deposition, Mr. Maul produced for the first time an email chain—dated from April 17, 2012 and April 24, 2012—between him and Mrs. Markey relating to the air testing that Insight Environmental had been engaged to perform.  *See* **Exhibit 14**.  As noted above, the emails had not previously been produced by the Markeys in their initial disclosures in May 2013 or in response to Lapolla's July, 23, 2013 Requests for Production to the Markeys, which included the following pertinent requests:

117. All communications between any of the Plaintiffs and Insight Environmental Solutions.

118. All communications between any of the Plaintiffs and George Maul.

119. All documents provided by Insight Environmental Solutions to Plaintiffs.

120. All documents provided by George Maul to Plaintiffs.

121. All documents provided by Plaintiffs to Insight Environmental Solutions to Plaintiffs.

122. All documents provided by Plaintiffs to George Maul.

*See* **Exhibit 15**.

35.    In light of the belated production of the April **2012** emails, at the April 23, 2014

deposition of Mr. Maul, Lapolla's counsel urged that Mr. Maul go back and more diligently search

for any other emails that were not previously produced between him and Mrs. Markey.   The

following Saturday, on April 26, 2014, Mr. Maul produced even more previously unproduced emails

with attachments between him and Mrs. Markey, including the email explaining why there were two

different versions of a May 25, 2012 report from Insight Environmental.   These emails and

attachments were immediately forwarded to attorneys with Morelli Alters Ratner PC.  *See* **Exhibits**

**A-L**.

36.    The most significant of the emails produced by Mr. Maul was an email dated July

25, 2012 where Mrs. Markey wrote to George Maul, as follows:

> Hi George,
>
> I would have included this in my other email, but just found out now that our new
> attorney would like some more information included in your report, if this is
> possible. Please let me know how much the additional charge is and I will mail it to
> you ASAP. The information he would like you to include we had discussed with you
> after you spoke with the lab, regarding how the elevated levels found...... even
> though are within OSHA's permissible exposure limits etc that we are a residence
> being exposed 24/7 so to speak.   You wrote that the odor present appears to be a
> nuisance odor and should not negatively impact the health of anyone occupying the
> area. The issue with that statement is that nobody knows the impact of these
> compounds as far as being exposed daily......for 24 hrs, nor is there a set exposure
> limit for home environments with many of these spray foam chemicals because they
> are not usually found in homes. We have also been exposed during spraying as well
> and this leads to sensitization. The other thing that I think should be included is that
> nobody knows how long this will take to off-gass [sic] completely. So the overall
> issue is that we need more of the "what if's or unknowns" regarding the
> exposure/off-gassing to the spray foam included in the report that we spoke about.
> Is this possible? If there is anything I just stated that you disagree with and don't feel
> comfortable including in your report, please let me know what you think. Thanks
> again!
>
> Sincerely,
> Kristine Markey

*See* **Exhibit H**. Thus, from Mrs. Markey's email, it is clear that, per the advice of Mrs. Markey's "new attorney" after reading the original report, the Markeys sought to have Mr. Maul change his report.

37.     Upon information and belief, the "new attorney" was Morelli Alters Ratner PC or its Florida based co-counsel since on June 2, 2012, in the same email chain between Mrs. Markey and Mr. Maul, Mrs. Markey mentioned to Mr. Maul that they had an existing attorney, as follows: "I wanted to give you a "heads up" our attorney Barry Cohen will be contacting you."  Thus, the "new attorney" was most likely Morelli Alters Ratner PC or its Florida co-counsel since the lawsuit was filed just a month and a half later on September 14, 2012.

38.     From the foregoing, it appears that not only did the Markeys knowingly and intentionally withhold a very damaging and unaltered version of the May 25, 2012 Insight Environmental Report, which stated that "the odor present appears to be a nuisance odor and should not negatively impact the health of anyone occupying the area," but it also appears that the Morelli Alters Ratner PC firm knew of the original report as early as July 25, 2012 but did never produced it to Lapolla or disclosed its existence.

39.     In light of these revelations, Lapolla's counsel had planned to interrogate the Markeys about the altered report and the failure of the Markeys to produce the report and multiple related emails during their depositions scheduled just a few days later, starting on April 30, 2014. Two days before the Markey depositions were to begin, however, the Morelli Alters Ratner PC firm sent an email on April 28, 2014 to Lapolla's counsel stating, as follows:

Counsel,

We will be filing a Motion to Withdraw as Counsel for Plaintiffs shortly.  We are also requesting that discovery be stayed pending the resolution of this Motion.  Accordingly, no more depositions will go forward until this Motion is resolved.

*See* **Exhibit 16**.  Thus, the depositions were unilaterally canceled, despite the fact that they were scheduled by agreement over a month prior, on March 17, 2014.  The same day, Morelli Alters Ratner PC filed their motion to withdraw.  *See* **Exhibit 17**.

40.    Lapolla's counsel had been specifically preparing for the Markeys' depositions, being the key depositions in the case, since as early as April 14, 2014, not including the earlier review of documents produced by the Plaintiffs and other parties and non-parties as such documents were produced.   Additionally, Lapolla's counsel had incurred significant expenses in scheduling deposition services and in obtaining travel and lodging arrangements in order to take the Markeys' depositions.  Lapolla's lead counsel, Matthew Kornhauser, was scheduled to fly to New York the following morning for the depositions.   In light of the letter by the Markeys' attorney cancelling the deposition, Mr. Kornhauser made arrangements to delay the flight to later in the afternoon until the parties could participate in an emergency telephone hearing with the court.

41.    On April 29, 2014, the court stayed discovery until the Motion to Withdraw had been addressed.  *See* **Exhibit 18**.

42.    That same day, on April 29, 2014, Delfino's counsel was able to recover additional emails from another air testing consultant of the Markeys, which revealed for the first time the May 29, 2012 email from Insight Environmental forwarding the original, unaltered version of the May 25, 2012 report from Insight Environmental.  *See* **Exhibit 19**.   Although this email had been withheld by the air testing consultant based on an assertion of attorney-client privilege, since it had

been forwarded to the Markeys' former pre-lawsuit attorney, Barry S. Cohen, the underlying email between Mrs. Markey and Insight Environmental was never produced by the Markeys or their litigation counsel in this case.

43.     On April 30, 2014, the court ordered the parties' counsel as well as the Markeys to attend a hearing on May 1, 2014 to address the Motion to Withdraw.   *See* **Exhibit 20**.

44.     Lapolla's counsel traveled to New York for the hearing where the court ultimately granted the Motion to Withdraw.  *See* **Exhibit 21**.  The court also ordered the Markeys to retain new counsel within 30 days and that the discovery stay would be lifted 30 days after the Markeys' new counsel made an appearance.

45.     On May 14, 2014, Lapolla received a letter from the Markeys' new attorney, A. Craig Purcell, indicating that he had been retained for the purpose of seeking a discontinuance of the case, with prejudice.  *See* **Exhibit 22**.

46.     On May 29, 2014, Mr. Purcell filed it notice of appearance and subsequently the Markeys' Motion to Dismiss, which sought to dismiss the case without prejudice but also without any costs paid to the Defendants.  *See* **Exhibit 23** and **Exhibit 24**.

47.     By seeking to dismiss their case, it appears that the Plaintiffs understood, as did their former counsel, that the case was meritless to begin with.

**D.     The Markeys and their former counsel continued to assert that both of the Markeys suffered personal injuries caused by Lapolla's SPF even though Mrs. Markey's doctors found the opposite and even though there was no evidence showing Mr. Markey had suffered any personal injury at all.**

48.     In addition to the above-referenced discovery abuse and misconduct by failing to produce or disclose key documents and communications, the Markeys and their former attorneys also violated basic pleading requirements by initially filing and then amending the complaint without

any factual basis suggesting that the Markeys had suffered personal injury caused by Lapolla's SPF.

The original complaint filed in September 2012 stated one of the primary allegations of the Markeys,

as follows:

> Plaintiffs . . . have been exposed to greater than normal levels of toxic gases/compounds as a result of exposures to Defendants' problematic and unfit SPF and have suffered personal injuries as a result.

*See* **Exhibit 1**, at p. 21.  The Markeys' first Amended Complaint, filed on February 20, 2013,

similarly asserted as follows:

> As a direct and proximate result of the installation of Lapolla's problematic and unfit SPF and the harmful effects of the gases emitting from those products. Plaintiffs . . . have suffered, and continue to suffer economic harm and personal injury.

*See* **Exhibit 25**, at p. 7. The Markeys' second and live complaint, filed on November 22, 2013, also

asserted as follows:

> As a direct and proximate result of the installation of Lapolla's problematic and unfit SPF and the harmful effects of the gases emitting from those products, Plaintiffs have suffered, and continue to suffer economic harm and personal injury.

*See* **Exhibit 26**, at p. 6.  Thus, the Markeys and their attorneys unquestionably asserted that there

was some factual basis for their allegation that they—both of them—had suffered personal injuries

from Lapolla's SPF.

49.    Based upon the dearth of evidence indicating personal injury causation, and in

particular the evidence indicating the complete opposite, the Defendants joined in a November 1,

2013 letter[3] to the Court indicating that a *Lone Pine* order[4] was appropriate.  *See* **Exhibit 27**  Simply

put, the Markeys' medical records—obtained through subpoenas—showed that there was no

evidence that either Mr. or Mrs. Markey had suffered any injuries caused by the SPF.

50.     In fact, Mr. Markey's medical records did not suggest that he had experienced any

symptoms at all after the SPF was installed in his home in March of 2012.

51.     As to Mrs. Markey, her medical records revealed that, despite her belief to the

contrary, there was no objective evidence to suggest she was suffering any symptom or illness

caused by the SPF.  For example, her internist, Dr. Susan Lee, testified consistent with the medical

records' findings, as follows:

```
                                 90
24  Q   What did you tell her specifically
25  in regard to her focus on these toxic fumes
                                 91
 1             S. Lee, M.D.
 2  from construction?
 3      A   Well, I tried to reassure her that
 4  the extensive blood tests and radiologic tests
 5  and neurologic tests, the EMG testing that she
 6  had, was completely normal.  And so I felt that
 7  nothing happened to her that was dangerous.
 8      Q   In other words, she wasn't
```

---

[3]Notably, this second and final amended complaint of the Markeys was filed shortly **after** the
original unaltered version of the May 25, 2012 Insight Environmental report had been produced
on October 7, 2013, in response to a non-party subpoena, which indicated that any chemicals
found in the air tests were so low that they "should not negatively impact the health of anyone
occupying the area."

[4] The letter noted that "a Lone Pine order would impose a minimal burden on plaintiffs,
as it merely asks them to produce information they should already have." *In re Fosamax Prods.
Liab. Litig.*, No. 06 MD 1789 (JFK), 2012 U.S. Dist. LEXIS 166734, at * 6 (S.D.N.Y. Nov. 20,
2012) (citing *In re Vioxx Prods. Liab. Litig.*, 557 F. Supp. 2d 741, 744 (E.D. La. 2008), which
stated that "[t]he Court finds that at this advanced stage of the litigation, it is not too much to ask
a Plaintiff to provide some kind of evidence to support their claim that Vioxx caused them
personal injury").

```
 9  poisoned?
10      A   Correct.
11      Q   And she wasn't injured by virtue
12  of being exposed to toxic fumes?
13      A   That's how I felt, yes.
14      Q   And you shared that with her?
15      A   Yes, I did.
16      Q   What was her reaction to that?
17      A   She was very upset.
```

*See* **Exhibit 28**.  To confirm her findings, Dr. Lee referred Mrs. Markey to a neurologist, Dr.

Rahman Pourmand.  Dr. Pourmand reached the same conclusions of Dr. Lee.  Consistent with his

medical records for Mrs. Markey, Dr. Pourmand testified that there was no objective evidence that

there was any injury caused by the SPF, as follows:

```
                             70
15   Q   Would it be fair to say that your
16  opinion that there's no correlation between the
17  toxic exposure and Ms. Markey's symptoms is
18  based upon a reasonable degree of medical
19  probability?
20      A   Yes.
. . .
                             98
18  Q   About that, you found no evidence
19  of neuropathy based on your clinical
20  examination of Ms. Markey, irrespective of
21  whether she believed that her symptoms were
22  caused by exposure to chemicals; is that true?
23      A   No objective evidence of
24  neuropathy, yes.
25      Q   So irrespective of what Ms. Markey
                             99
 1          R. Pourmand, M.D.
 2  thinks may have caused her symptoms, you found
 3  no evidence, no objective evidence of
 4  neuropathy?
 5      A   Right.
 6      Q   You found no objective evidence of
 7  neuropathy based on your EMG test also,
 8  irrespective of what Ms. Markey thinks was
```

```
 9  causing her symptoms; isn't that true?
10      A   Yes.
11      Q   And you found no objective
12  evidence of abnormalities on her MRI study,
13  irrespective of what Ms. Markey might have
14  believed was causing her symptoms; isn't that
15  true?
16      A   That's true.
```

*See* **Exhibit 29**.

52.     Even more significant, in response to the Defendants' joint request for a *Lone Pine*

Order, the Court conducted a hearing where the Markeys' attorney conceded there was no medical

evidence to suggest that Mrs. Markey had suffered any injury or illness from the SPF, as follows:

> With respect to the issue of the requested *Lone Pine* Order, Plaintiffs' counsel
> represented that Mrs. Markey has not yet been able to link her claims of injury to the
> spray foam that is the subject of this litigation. Mrs. Markey has an appointment
> scheduled with a chemical specialist at the end of this month. If the specialist does
> not find any link between Mrs. Markey's medical issues and the subject spray foam,
> then Plaintiffs will remove the allegations of personal injury in the Complaint. If the
> specialist does find a link between the injuries and the spray foam, Plaintiffs will
> serve the specialist's findings upon the Defendants pursuant to Rule 26 and those
> allegations will remain part of the Complaint. Counsel are to resolve this issue by
> January 15, 2013.

*See* **Exhibit 30**.  Shockingly, this representation was made to the court despite the Markeys having

made such factual allegations in their pleadings filed over a year earlier, in September of 2012, and

then repeated in subsequent amendments in February and November 2013.

53.     With respect to the  deadline of January 15, 2014 to produce a report showing some

causal link between any injuries and Lapolla's SPF, the Markeys were unable to comply with the

Court's order.  As such, during a February 5, 2014 hearing, the Court extended the deadline to

March 3, 2014.  *See* **Exhibit 31**.  Although the Markeys ultimately produced a report by a physician,

Grace Ziem,[5] on March 3, 2014, the report was dated December 17, 2013, a month before the initial deadline.  *See* **Exhibit 32**. No explanation was ever provided as to why the December report was not produced by the January deadline or sometime shortly thereafter.

54.     In any event, the report was fatally flawed and would not have survived a *Daubert* analysis.  Moreover, no report was provided suggesting Mr. Markey had suffered any injury caused by the SPF, despite the pleadings making contrary allegations.  After the Ziem report was produced, the Markeys did not amend their pleadings to limit the personal injury allegations to just Mrs. Markey.

55.     Upon receipt of the report on March 3, 2014, Lapolla immediately conducted background research and discovered that Dr. Ziem has been the subject of numerous *Daubert* or *Daubert*-like motions in numerous courts and before administrative agencies.  In  practically all these cases, Dr. Ziem's opinions were excluded.  *See, e.g., Chanin v. Eastern Vir. Med. Sch.*, 459 S.E.2d 523, 524-25 (Va. Ct. App. 1995) (affirming decision that "the opinion of Dr. Ziem . . . was 'based on an incorrect understanding of the facts" and that "Dr. Ziem was unable to identify any substances . . . that could have caused" the subject injury); *Minner v. American Mortg. & Guar. Co.*, 791 A.2d 826, 849 (Del. Super. 2000) (finding that Dr. Ziem's opinions regarding multiple-chemical sensitivity and causation were excluded from the jury in a civil case as "unreliable" and "based on nothing other than speculation"); *Yang v. E.I. du Pont de Nemours & Co.*, No. Civ.A.04A-01-0008 MMJ, 2004 Del. Super. LEXIS 408, at *7-8, 19 (Del. Super. 2004), *affirmed* 877 A.2d 53 (De. 2005) (affirming the finding that "the testimony of Dr. Grace Ziem" not "credible that Claimant suffered from the presence of a peripheral neuropathy"); *Mason v. Home Depot U.S.A., Inc.*, 658 S.E.2d 603,

---

[5]The background of Dr. Grace Ziem is available on her website, Chemical Injury.net, as follows: http://www.chemicalinjury.net/biosketch.htm (last visited July 3, 2014).

610-11 (Ga. 2008) (affirming trial court's ruling "fault[ing] Dr. Ziem's methods as being based only on her own experience and opinions, without any support in published scientific journals or any reliable techniques for discerning the behaviors and effects of the chemicals"); *Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205, 1209, 1211 (E.D. Tenn. 2000) (finding it "abundantly clear to the Court that Dr. Ziem's testimony falls well short of the standard for scientific reliability pursuant to Rule 702 and *Daubert*" and that "[Dr. Ziem] may not . . .offer any opinion that [plaintiff's] medical condition was caused by chemicals, fumes, or inhalants"); *Chriestenson v. Russell Stover Candies*, 263 P.3d 821, 827 (Kan. Ct. App. 2011) (finding that "we find that [Dr. Ziem's] causation opinion is not based on substantial evidence"); *Latouche v. N. Country Union High Sch.*, State Vermont Dept. Lab. & Indus., Opinion No. 58-98WC (Oct. 19, 1998) (stating "[g]iven the unreliability of Dr. Ziem's documentation, her opinions cannot be accepted"). *Taft v. Blue Mountain Union Sch.*, State Vermont Dept. Lab. & Indus., Opinion No. 10-99WC (Mar. 24, 1999) (finding that claimant failed to meet her burden in part due to the "exaggeration or misstatements of fact by Dr. Ziem of some conditions at BMUS as a factor in reaching her conclusion on causation").

56.     Additionally, Lapolla discovered that Dr. Ziem herself had a history of discovery abuse. *See Freeman v. Schointuck*, 192 F.R.D. 187, 188, 2000 U.S. Dist. LEXIS 11188, at *2 (D. Md. 2000) (noting that "the Court found that when originally deposed . . . Dr. Ziem's answers often were evasive, incomplete, and non-responsive"); *Cabana v. Forcier*, 200 F.R.D. 9, 16, 2001 U.S. Dist. LEXIS 8495, at *20-21 (D. Mass. 2001) (finding that Dr. Ziem's "requested fees [to give testimony at a deposition] are simply unconscionable" and that "[a]warding such fees would constitute an abuse of Rule 26(b)(4)(c)").

57.    Not surprisingly, Dr. Ziem's December 17, 2013 report, just like the numerous cases listed above, failed to provide any evidence or analysis of a causal link between her purported diagnoses of Mrs. Markey of "toxic encephalopathy," "reactive airway disease involving the upper respiratory tract . . . and the lower respiratory tract," "recurring hypoxia in the brain," "exacerbation of migraine," and "sleep disturbance." Instead, Dr. Ziem's report merely states, *ipse dixit,* that the "diagnoses listed in these paragraphs are as a consequence of her exposure to the toxic isocyanates and other chemical mixtures, and the particulate exposure of the spray foam insulation."

58.    Despite discussion about specific chemicals allegedly found in the Markeys' home and allegedly emitted from Lapolla's SPF, including acetic acid and tris (2-chlorolsopropyl) phosphate, Dr. Ziem's report does not suggest either of those specific chemicals actually caused the alleged diagnosed conditions. Nowhere in the report does Dr. Ziem suggest that acetic acid and tris (2-chlorolsopropyl) phosphate were in fact the "toxic isocyanates," "other chemical mixtures," or "particulate" that allegedly caused such alleged illnesses.

59.    Just like the cases cited above, it is abundantly clear that Dr. Ziem's conclusions hinge upon unsupported assumptions, including the assumption about the source of any alleged chemicals in the home.  The Markeys' home addition was undergoing construction during the time of testing.  Dr. Ziem's report does not explain how she or anyone else confirmed whether the source of any particular chemical allegedly found in the Markeys' home or at the level measured emitted from the SPF, as opposed to some other source.  Moreover, nothing in the reports addresses the facts and analysis set out in the medical records of Mrs. Markeys' treating physicians, Dr. Lee and Dr. Pourmand.  Additionally, the facts and symptoms described in the medical records of Dr. Lee and

Dr. Pourmand contradict the vague and conclusory information set out in Dr. Ziem's report regarding Mrs. Markey's symptoms.

60.     Simply put, Dr. Ziem's conclusions are "unreliable" and "based on nothing other than speculation" *E.g.*, *Minner*, 791 A.2d at 849.   Thus, the late production of Dr. Ziem's report did nothing to support the dearth of evidence to suggest that Mrs. Markey had suffered some personal injury from Lapolla's SPF.   No evidence was ever produced regarding Mr. Markey. These facts provide some explanation for the Markeys' decision to dismiss their case, as well as their former attorneys' decision to withdraw.

## II.  LEGAL BASES FOR SANCTIONS

61.     Lapolla moves that the Court impose sanctions against the Markeys and their former counsel, Morelli Alters Ratner, pursuant to the Rule26, Rule 37, 28 U.S.C. § 1927, and the Court's inherent power.  Since the Markeys have already sought to dismiss their claims with prejudice and Morelli Alters Ratner has already withdrawn, the only remedy that would be appropriate to redress the prejudice placed upon Lapolla, and to deter such conduct in the future, would be for the Markeys and Morelli Alters Ratner to reimburse Lapolla for its attorney's fees and costs.

**A.     Rule 26 and Rule 37 sanctions against the Markeys and Morelli Alters Ratner are warranted.**

62.     Federal Rule of Civil Procedure 26(g)(1) provides that "[e]very disclosure required under Rule 26(a)(1) . . . must be signed by at least one attorney of record in the attorney's own name" and that "[b]y signing, an attorney . . . certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry: (A) with respect to a disclosure, it is complete and correct as of the time it is made; and (B )with respect to a discovery . . . response, .

. . it is: . . . not interposed for any improper purpose, such as to . . . cause unnecessary delay, or needlessly increase the cost of litigation."

63.    Rule 26(e) provides that "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure . . . in a timely manner if the party learns that is some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

64.    Federal Rule of Civil Procedure 26(g)(3) provides that "[i]f a certification violates this rule without substantial justification, the court on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both."  "The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation."  FED. R. CIV. P. 26(g)(3).

65.    Similarly, Rule 37(b) provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), . . . the court, on motion and after an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure."  FED. R. CIV. P. 37(c)(1)(A).  "The duty to supplement applies whether the corrective information is learned by the client or by the attorney."  *Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012).  "Moreover, the federal discovery rules place a duty on a party to turn over not only proper materials of which he is aware, but also those of which he reasonably ought to have been aware." *Id.*  The purpose of the sanctions is "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who

might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976).

66.     The party requesting sanctions under Rule 37 has the burden of proving the following:

(1) the party having control over the evidence had an obligation to timely produce it; (2) the party that failed to timely produce the evidence had a 'culpable state of mind'; and (3) the evidence that was withheld was relevant to the party's claim or defense such that a reasonable trier of fact could find that it supports that claim or defense. *Lodge v. United Homes, LLC*, 787 F. Supp. 2d 247, 258 (E.D.N.Y. 2011) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). Proving the element requiring a culpable state of mind is done by showing the party has breached their discovery obligation in bad faith, through gross negligence, or through ordinary negligence. *Residential Funding*, 306 F.3d at 113.

67.     "Upon finding that the moving party has carried its burden under Rule 37, the court should endeavor to impose a sanction that will restore the parties to the position they would have occupied but for the breach of discovery obligations and deter future misconduct." *In re September 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 131-32 (S.D.N.Y. 2007). "A district court has wide discretion to impose sanctions, including severe sanctions, under Rule 37, and its ruling will be reversed only if it constitutes an abuse of discretion." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006).

68.     "Numerous factors are relevant to a district court's exercise of its broad discretion to order sanctions under Rule 37, including: (1) the willfulness of the noncompliant party or the reasons for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of

noncompliance; and (4) whether the noncompliant party had been warned of the consequences of his noncompliance." *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002).

69.     An example of a failure to supplement discovery responses leading to sanctions is found in *Lodge v. United Homes*, LLC where the defendants failed to supplement their initial disclosures and discovery responses. 787 F. Supp. 2d 247, 263 (E.D.N.Y. 2011). In addition to the failure to supplement, the course of offending conduct lasted over five years. *Id.* Ultimately, the court ordered the defendant to compensate the plaintiff for the costs and fees incurred pursuing the discovery and defending against the motions related to the withheld evidence. *Id.* at 264.

70.     The issue of sanctions for improper certifications was litigated in *Kosher Sports Inc., v. Queens Ballpark Co., LLC.*, No. 10-CV-2618, 2011 U.S. Dist. LEXIS 86651 (E.D.N.Y. Aug. 11, 2011). There, plaintiff's counsel provided and signed a response to a discovery request that failed to disclose a recording that was covered by the request. *Id.* at 31. The court found the "attempt to unilaterally delay its production, without court authorization or even notice to opposing counsel, was not warranted by existing law or by any non-frivolous argument for changing existing law; his misleading responses to defendant's discovery demands contravened the bedrock principle underlying the discovery rules, to wit, 'that parties be forthcoming with relevant information in their possession.'" *Id.* at 32 (quoting *Rofail v. United States*, 227 F.R.D. 53, 58 (E.D.N.Y. 2005). Pursuant to Rule 26(g), the court ordered plaintiff and plaintiff's counsel to bear joint responsibility for defendant's reasonable expenses and attorney's fees. *Id.* at 44, 45.

71.     Here, it is undisputed that the Markeys and Morelli Alters Ratner never produced the original, unaltered version of the Insight Environmental report or any of the emails between Mrs. Markey and Insight Environmental relating to that initial report and the circumstances under which

the second, altered version was created to replace the original version.  This is true even though the Markeys were clearly aware of both reports and the emails.  This is also true even though Morelli Alters Ratner, upon information and belief, was aware of the report before filing suit, and certainly became aware of the report after it was produced in October 2013 by Insight Environmental in response to Lapolla's subpoena.

72.     Surely the production of a different version of a report from Insight Environmental, dated the same day, would have prompted some discussion between the Markeys and Morelli Alters Ratner regarding how these two reports came about and how they were delivered to the Markeys by Insight Environmental.  Such was not the case, despite the ongoing duty to supplement and disclose such information. Then, with suspicious timing, once these emails are produced, Morelli Alters Ratner move to withdraw, unilaterally cancelling the Markeys' depositions which had been scheduled to start just a few days later.

73.     In light of the foregoing, Lapolla moves that the Markeys and Morelli Alters Ratner be held jointly and severally liable to pay for Lapolla's attorney's fees and costs incurred caused by such failures.

**B.     28 U.S.C. § 1927 sanctions against Morelli Alters Ratner are warranted.**

74.     Under 28 U.S.C. § 1927, the court may order an attorney to "satisfy personally the excess costs, expenses, and attorneys' fees" resulting from misconduct that "multiplies the proceedings in any case unreasonably and vexatiously."  28 U.S.C. § 1927. "Bad faith may be inferred only if the [attorney's] actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (internal quotation marks omitted); *accord*

*McCune v. Rugged Entertainment, LLC*, No. 08 CV 2677, 2010 U.S. Dist. LEXIS 30102, 2010 WL 1189390, at *2 (E.D.N.Y. March 29, 2010). Sanctionable behavior under § 1927 includes bringing claims for an improper purpose, pursuing abusive litigation practices, and "continually engaging in obfuscation of the issues." *See Keller v. Mobil Corp.*, 55 F.3d 94, 99 (2d Cir. 1995) (internal quotation marks omitted); *see also Dahiya v. Kramer*, No. 13-CV-3079, 2014 U.S. Dist. LEXIS 41425, 2014 WL 1278131, at *8 (E.D.N.Y. March 27, 2014) (affirming § 1927 sanctions where counsel pursued meritless claims for personal reasons at expense of client's interests); *KGK Jewelry LLC v. ESDNetwork*, No. 11 Civ. 9236, 2014 U.S. Dist. LEXIS 38630, 2014 WL 1199326, at *6 (S.D.N.Y. March 21, 2014) (sanctions under § 1927 warranted where counsel issued subpoenas for purposes of harassment).

75.     Here, not only did the failure to produce the Insight Environmental report and related emails result in the obfuscation of the issues, but Morelli Alters Ratner's prosecution of the Markeys' claims knowing that the Markeys simply had no evidence to support their claims of personal injuries constitutes abusive litigation practices by bringing meritless claims against Lapolla. Bad faith can be inferred from such conduct.

76.     In light of the foregoing, Lapolla moves that Morelli Alters Ratner be held liable to pay for Lapolla's attorney's fees and costs incurred caused by such failures.

**C.     Sanctions against the Markeys and Morelli Alters Ratner under the court's inherent power are warranted.**

77.      Imposing sanctions under the court's inherent power requires a similar showing of bad faith as that necessary to invoke § 1927.  *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143-44 (2d Cir. 2012) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)). Indeed, "the only meaningful difference between an award made under § 1927 and one made pursuant to the

court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Oliveri*, 803 F.2d at 1273.

78.     Here, as noted above, the Markeys and Morelli Alters Ratner were all complicit in withholding key evidence from Lapolla and in the decision to prosecute baseless claims against Lapolla.

79.     In light of the foregoing, Lapolla moves that the Markeys and Morelli Alters Ratner be held jointly and severally liable to pay for Lapolla's attorney's fees and costs incurred caused by such failures.

### III.  Relief Requested

80.     Although requiring the Markeys and Morelli Alters Ratner to pay for Lapolla's attorney's fees and costs is a harsh sanction, a court "'should not shrink from imposing harsh sanctions where . . . they are clearly warranted.'" *E.g., Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 735 (2d Cir. 1987) (quoting *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) (alteration in original)). The egregiousness of the efforts to hide a key exculpatory report, as well as the related communications that would have revealed the wrongful scheme, the fact that both parties and attorney participated in such efforts, and the length of time that the discovery abuse and abuse of the legal system continued all show that imposing harsh sanctions are clearly warranted in this case.

81.     Importantly, the fact that the Markeys now seek to dismiss their case with prejudice should not affect the Court's decision to impose monetary sanctions against them or their former attorneys, Morelli Alters Ratner.  In fact, the voluntary dismissal should be considered at least an

acknowledgment of the meritless nature of the Markeys' claims.  Although the dismissal with prejudice will result a "win" for Lapolla, without ordering the reimbursement of Lapolla's incurred attorney's fees and costs on the Markeys and Morelli Alters Ratner, Lapolla will still have "lost" by having spent so much of its time, energy, and financial resources in defending a case that never should have been brought in the first place.

82.     In addition to those losses, Lapolla's reputation of providing safe and effective insulation products has been unnecessarily tarnished, a harm that although difficult to quantify is palpable.  Furthermore, a dismissal without an order for sanctions will do nothing to prevent such parties' and attorneys' vexatious litigation practices in the future.

83.     Simply put, the discovery process, and the legal system itself, should not be so abused without serious accountability for such abusers.  Accordingly, Lapolla moves that the Court order the Markeys and Morelli Alters Ratner be held liable for, jointly and severally, and be compelled to pay Lapolla's legal fees and costs.

84.     Between March 2013 and May 2014, Lapolla had incurred a total of $375,669.34 in legal fees and expenses ($341,115.50 in legal fees and $34,586.44 in expenses) from its lead counsel, Hoover Slovacek LLP, while defending against the Markeys' case.  *See* **Exhibit 33**. Between March 2013 and May 2014, Lapolla had incurred a total of $33,340.99 in legal fees and expenses ($32,126.80 in legal fees and $1,214.19 in expenses) from its local counsel,  Greenbaum Rowe Smith & Davis, LLP, while defending against the Markeys' case.  *See* **Exhibit 34**. These amounts do not include the fees and costs incurred by Lapolla from its prior counsel, Baker Hostetler LLP.  Lastly, these amounts do not include the fees and costs incurred in connection with this

motion and related matters in June and July of 2014.  Lapolla will supplement this motion once those amounts have been calculated and finalized.

85.     Considering the conduct of the Markeys and Morelli Alters Ratner, and the frivolous nature of the Markeys' claims, Lapolla contends that an appropriate sanction would be for the Markeys and Morelli Alters Ratner to be liable for and pay Lapolla for all of its $409,10.33 in legal fees and expenses.

86.     To the extent necessary, however, Lapolla would request that the Court conduct an evidentiary hearing to allow Lapolla to provide testimony and/or other relevant evidence regarding such fees and costs and, if required by the Court, in order to segregate any portion of such fees and costs that the Courts deems appropriate for an award of sanctions under the circumstances.

Respectfully Submitted,

By: /s/ Dylan B. Russell
Dylan B. Russell
Texas SBN: 24041839
HOOVER SLOVACEK LLP
5847 San Felipe, Suite 2200
Houston, Texas 77057
russell@hooverslovacek.com
Tel:  (713) 977-8686
Fax: (713) 977-5395

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 8th day of July, 2014, a true and correct copy of the foregoing document was filed and served via Electronic Case Filing (ECF) on all counsel of record who have consented to electronic service and is available for viewing and downloading from the ECF system, and served on all non-ECF counsel of record via U.S. First Class Mail and other person, as follows:

A. Craig Purcell, Esq.
Glynn Mercep and Purcell, LLP
P.O. Box 712, North Country Road
Stony Brook, New York 11790

Robert W. Gifford, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Attorneys for Defendant Delfino Insulation Company, Inc.
88 Pine Street, 24th Floor
New York, New York 10005

/s/ Dylan B. Russell
Dylan B. Russell
