**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
NEIL and KRISTINE MARKEY, individually
And on behalf of all others similarly situated,

                   Plaintiffs,

                - against -

LAPOLLA INDUSTRIES, INC., a Delaware
corporation; LAPOLLA INTERNATIONAL,
INC.,a Delaware corporation; and DELFINO
INSULATION COMPANY, INC., a New York
corporation,

                  Defendants.
-----------------------------------------------------------X

                               **REPORT AND**
                           **RECOMMENDATION**

                           CV 12-4622 (JS) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.     <u>PRELIMINARY STATEMENT</u>

      Plaintiffs Neil Markey ("Mr. Markey") and Kristine Markey ("Mrs. Markey")

(collectively, "the Markeys" or "Plaintiffs") brought this putative negligence and products

liability class action against Lapolla Industries, Inc. and Lapolla International, Inc. (collectively,

"Lapolla"), and Delfino Insulation Company, Inc. ("Delfino") (collectively, "Defendants").

Plaintiffs alleged that they suffered personal injuries and property damage caused by spray

polyurethane foam insulation ("SPF") manufactured by Lapolla, which was installed in

Plaintiffs' home by Delfino.  *See generally* Second Amended Complaint ("SAC") [DE 61].

After Plaintiffs' former counsel, Morelli Alters Ratner, LLP ("MAR"), was relieved as counsel

of record in this matter, *see* DE 82, Plaintiffs, through new counsel, moved to voluntarily dismiss

this action with prejudice, *see* DE 84.

Following Plaintiffs' motion to dismiss, Lapolla filed the instant motion seeking monetary sanctions against Plaintiffs and MAR, pursuant to Federal Rules of Civil Procedure 26 and 37, 28 U.S.C. § 1927, and the Court's inherent powers.  *See* DE 88.  Lapolla asserts that Plaintiffs and MAR should be sanctioned based on their failure to disclose certain documents during discovery, and for having brought and maintained an allegedly frivolous lawsuit against Lapolla.  *See generally id.*  Plaintiffs and MAR oppose the motion, arguing that Lapolla has not met its burden of demonstrating that sanctions are warranted under the circumstances presented here.  *See generally* DE 94-97.  Judge Seybert referred Lapolla's motion to this Court for a Report and Recommendation "on whether the motion should be granted and, if necessary, to determine the appropriate amount of fees and/or costs to be awarded."  DE 104.  Judge Seybert thereafter granted Plaintiffs' motion to dismiss this action but retained jurisdiction to resolve Lapolla's motion for sanctions.  DE 110.

The Court conducted an evidentiary hearing on Lapolla's motion in March and April 2015.  *See* Elec. Orders of 3/23/15, 4/6/15 and 4/17/15.  The Court now issues its findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure. After carefully considering the evidence introduced at the hearing, the arguments of counsel, and the controlling law on the issues presented, the Court concludes that Lapolla has met its burden of proof on its motion to impose sanctions on MAR under Rules 26(g) and 37(c) for violating its discovery obligations.  However, Lapolla has not demonstrated that discovery sanctions should be imposed against the Markeys.  Lapolla also has not carried its burden of proof with respect to its request to impose sanctions against MAR and Plaintiffs pursuant to § 1927 and/or the Court's inherent power.  Accordingly, the Court respectfully recommends to Judge Seybert that

Lapolla's motion be GRANTED, in part, and DENIED, in part, to the extent set forth in this Report and Recommendation.

## II.   BACKGROUND

On September 14, 2012, Plaintiffs commenced this case by filing a class action Complaint against Defendants alleging, *inter alia*, state law negligence, strict liability, and breach of warranty claims.  *See* DE 1 (the "Original Complaint").  Plaintiffs filed an Amended Complaint on February 20, 2013, *see* DE 23, and a Second Amended Complaint on November 22, 2013 which removed the class action claims, *see* DE 61.  Plaintiffs assert in their pleadings that, *inter alia*, they suffered personal injuries and property damages on account of "Lapolla's problematic and unfit SPF and the harmful effects of the gases emitting from those products."  Am. Compl. ¶¶ 24-26; *see* Compl. ¶¶ 27-29; SAC ¶¶ 21-22, 38, 47.  The pleadings seek monetary and equitable relief, including medical monitoring.  *See* Compl. ¶ 29; Am. Compl. ¶¶ 25-26; SAC ¶¶ 20, 22.

On February 27, 2013, Plaintiffs' counsel moved before the Judicial Panel of Multidistrict Litigation ("JPMDL") to transfer Plaintiffs' lawsuit and related federal litigation concerning SPF to the Southern District of Florida under the action *In re Spray Polyurethane Foam Insulation Litigation*, MDL No. 2444.  *See* JPMDL Motion, annexed as Ex. 2 to Defendant Lapolla's Memorandum of Law In Support of Motion for Sanctions ("Lapolla Mot.") [DE 89-2]. While the motion to transfer was pending before the JPMDL, Magistrate Judge Boyle, who was then assigned to this case, stayed discovery but directed the parties to exchange Rule 26(a)(1) Initial Disclosures.  *See* DE 40, 51.  On June 6, 2013, the JPMDL issued an order denying the motion to transfer.  *See* DE 52.  In light of the determination by the JPMDL, Judge Boyle lifted the stay of discovery.  *See* DE 54.

The parties met before this Court on November 6, 2013 for a Discovery Status Conference. *See* DE 60. In light of the paper documents produced by that date, Lapolla requested that the Court issue a *Lone Pine* Order[1] requiring Plaintiffs to produce medical evidence connecting their alleged personal injuries to Lapolla's SPF. DE 60 ¶ 3. The Court set a January 15, 2014 deadline for Plaintiffs to produce a report from their chemical specialist which linked Mrs. Markey's injuries to the SPF. *Id.* The Court subsequently extended that deadline to March 3, 2014. *See* DE 64 ¶ 2. Plaintiffs served the expert report of their chemical specialist on all parties by the March 3, 204 deadline. *See* DE 68.

On April 28, 2014, while the parties were in the process of conducting depositions – and prior to Lapolla conducting scheduled depositions of the Markeys – MAR filed a motion to withdraw as counsel of record for the Markeys. DE 76. MAR made the motion based on asserted "irreconcilable differences" which had arisen between MAR and the Plaintiffs "regarding the prosecution of this action." DE 76-1.

On April 29, 2014, the Court conducted an expedited telephone conference to address the status of discovery in the wake of MAR's motion to withdraw. DE 80. The Court concluded that, in light of the pending motion to withdraw, Plaintiffs' depositions could not go forward in the present circumstances. *Id.* ¶ 3. Accordingly, the Court suspended the deadlines to complete discovery, including the depositions of other fact and expert witnesses, pending Judge Seybert's

---

[1]     *Lone Pine* orders derive from a 1986 decision of the New Jersey Superior Court in *Lore v. Lone Pine Corp.*, 1986 WL 637507 (N.J. Sup. Ct. Law Div. Nov. 18, 1986), in which "'the New Jersey court entered a pretrial order that required the plaintiffs to provide facts in support of their claims through expert reports, or risk having their case dismissed." *In re Fosamax Products Liab. Litig.*, No. 06 MD 1789, 2012 WL 5877418, at *1 (S.D.N.Y. Nov. 20, 2012) (citing *Lone Pine*, 1986 WL 637507, at *1–*3). Federal courts have since noted that "'*Lone Pine* orders are designed to handle the complex issues and potential burdens of defendants and the court in mass tort litigation.'" *Id.* (quoting *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 340 (5th Cir. 2000)).

decision on the motion to withdraw.  *Id.* ¶ 5.  However, the Court "cautioned" the parties "that if the developing record here shows that the plaintiffs themselves have been acting in bad faith, then the defendants are free to pursue an appropriate application for sanctions which the Court will consider."  *Id.* ¶ 2.  The Court further reiterated "that if it finds, as information is disclosed and developed here, that the plaintiffs are not operating in good faith, the Court is prepared to impose appropriate sanctions, [i]ncluding monetary sanctions for the fiasco that has just been created."  *Id.* ¶ 4.

On May 1, 2014, following a hearing on MAR's motion to withdraw, Judge Seybert granted the motion and terminated MAR as counsel for Plaintiffs.  DE 82.  Judge Seybert gave Plaintiffs 30 days to retain new counsel and directed that the stay of discovery would be lifted 30 days after the appearance of new counsel, at which time the discovery schedule would be reset.  *Id.*

On May 29, 2014, A. Craig Purcell, a member of the law firm Glynn Mercep and Purcell, LLP, filed a Notice of Appearance on behalf of Plaintiffs.  DE 83.  That same day, Plaintiffs filed a motion before Judge Seybert seeking an Order dismissing this action with prejudice and without costs.  DE 84.  Lapolla opposed Plaintiffs' motion.  DE 87.[2]

Lapolla filed the instant motion on July 8, 2014 seeking sanctions against Plaintiffs and MAR under Federal Rules 26 and 37, § 1927, and the Court's inherent power.  *See* DE 88; *see generally* Lapolla Mot. [DE 89].  Plaintiffs and MAR filed their respective opposition papers on August 14, 2014.  *See* Plaintiffs' Memorandum of Law in Opposition to Lapolla's Motion for Sanctions ("Pls.' Opp.") [DE 96]; MAR's Memorandum of Law in Opposition to Lapolla's Motion for Sanctions ("MAR Opp.") [DE 97].  Lapolla filed its reply on October 10, 2014.  *See*

---

[2]     On August 28, 2014, Delfino filed a letter with the Court stating that it had "no objection" to Plaintiff's motion to dismiss the action with prejudice.  DE 99.

DE 102.  Judge Seybert thereafter referred Lapolla's motion for sanctions to this Court for a

Report and Recommendation on whether the motion should be granted and, if necessary, to

determine the appropriate amount of fees and/or costs to be awarded.  DE 104.

On January 6, 2015, the Court issued an Order setting this case down for a hearing on

Lapolla's motion for sanctions.  DE 105.  Prior to the commencement of the hearing, Judge

Seybert granted Plaintiffs' motion to dismiss this action, with prejudice, but expressly retained

jurisdiction to resolve Lapolla's pending motion for sanctions.  DE 110.

The Court conducted the evidentiary hearing on March 23, 2015; April 7, 2015; and

April 17, 2015.  The Court heard testimony from the following witnesses:  Mrs. Markey; Barry

Cohen, Esq., a partner at the law firm Certilman, Balin, Adler & Hyman, LLP and the Plaintiffs'

former counsel; George Maul, an industrial hygienist hired by the Markeys; John G. Griffin,

Esq., the Markeys' former counsel; David Sirotkin, Esq. of MAR; Mr. Markey; David Ratner,

Esq. of MAR; Richard Kurtz, the CEO of Lapolla; and Matthew Kornhauser, counsel to Lapolla.

Lapolla submitted its post-hearing brief on May 18, 2015.  *See* Lapolla's Post-Hearing

Brief in Support of Motion for Sanctions ("Lapolla's Post-Hrg. Brf.") [DE 122].  Plaintiffs and

MAR thereafter submitted their opposition briefs on June 16, 2015 and June 17, 2015,

respectively.  *See generally* Plaintiffs' Post-Hearing Brief In Opposition to Motion for Sanctions

("Pls.' Post-Hrg. Opp.") [DE 123]; MAR's Memorandum of Law In Opposition to Defendant

Lapolla's Post-Hearing Brief In Support of Motion for Sanctions ("MAR Post-Hrg. Opp.") [DE

124].[3]

---

[3]     There are some preliminary issues regarding the parties' post-hearing submissions.  First,
the June 17, 2015 letter submitted by Lapolla in response to Plaintiffs' post-hearing brief is
improper.  *See* DE 125.  At the conclusion of the hearing, the Court permitted the parties to
submit a post-hearing brief not to exceed 25 pages.  *See* 4/17/15 Tr., at 568:8-569:20.  The Court
did not allow the parties to file replies to each other's post-hearing submissions, and the Court
notes that Lapolla filed its reply letter without seeking permission from the Court.  Accordingly,

III.   **FINDINGS OF FACT**

The following section constitutes the Court's Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a)(1).  These Findings are drawn from witness testimony at the hearing and the parties' hearing exhibits.

A.      **George Maul's Report and Emails with Mrs. Markey**

In March 2012, Plaintiffs had SPF manufactured by Lapolla installed into an addition to their home.  Hearing Testimony of Mrs. Markey ("Mrs. Markey Test."), Transcript of March 23, 2015 Hearing ("3/23/15 Tr."), at 15:13-22.  After the installation, Mrs. Markey began to develop adverse medical symptoms, including numbness and tingling in her left hand, headaches in the back of her head, weakness, and low-grade fevers.  *See id.* at 16:14-15; Transcript of April 6, 2015 Hearing ("4/6/15 Tr."), at 236:11-14.  Mrs. Markey believed her symptoms may have been caused by her exposure to chemicals in the SPF.  *See* Mrs. Markey Test., 3/23/15 Tr., at 16:15-17.

Around April 17, 2012, Mrs. Markey contacted George Maul ("Maul"), an industrial hygienist for Insight Environmental, Inc. ("Insight Environmental"), about conducting air quality testing of Plaintiffs' home.  *Id.* at 21:12-25.  Mrs. Markey testified that she engaged Maul in order to find out whether she was breathing anything harmful and to determine whether she

---

Lapolla's June 17, 2015 reply letter was improperly filed and has not been considered in the Court's decision on the instant motion for sanctions.  Second, MAR's request in its post-hearing brief to strike the entirety of Lapolla's post-hearing brief is DENIED.  *See* MAR Post-Hrg. Brf. at 2.  Even if, as MAR contends, Lapolla did not strictly limit the content of its post-hearing submission to "the legal issues," as the Court directed at the conclusion of the hearing, *see* 4/17/15 Tr., at 568:3-7, the Court finds that any failure to comply with this directive does not warrant wholesale striking of Lapolla's brief.  Third, to the extent that Plaintiffs request for the first time at the conclusion of their post-hearing brief that sanctions be assessed against Lapolla "in the form of reimbursement of the more than $30,000 in legal fees expended by the Markeys in defending this motion for sanctions," *see* Pls.' Post-Hrg. Brf. at 13, Plaintiffs' request is DENIED.

should remain in her home or have the SPF removed.  *Id.* at 21:16-20, 25:17-20.  Maul similarly

testified it was his understanding that Plaintiffs contacted him because "Mrs. Markey was not

feeling well.  She felt that the spray foam was negatively impacting her and she wanted to have

the air tested."  Hearing Testimony of George Maul ("Maul Test."), *id.* at 136:19-22.  In late

April 2012, Maul took air samples from Plaintiffs' home and sent them to a lab for analysis.

Mrs. Markey Test., *id.* at 21:23-22:8.

On May 4, 2012, Maul emailed Mrs. Markey with the lab results of the air samples taken

from the addition.  *See* Maul May 4, 2012 Email, Lapolla Hearing Exhibit ("Hrg. Ex.") 8.

Maul's email states, in pertinent part:  "We have finally received the results.  As you can see

there are many highlighted compounds in the analysis.  This means they are elevated above the

detection limit.  Please keep in mind this does not mean they are unsafe."  *Id.*  Mrs. Markey

responded by email on May 7, 2012, stating, *inter alia*, that she had a chemistry professor

interpret the lab results and she asked Maul if the lab had tested for the presence of "urethanes."

Hrg. Ex. 8.  Mrs. Markey noted in her email that "we just want to make sure we are not breathing

anything toxic."  *Id.*

On May 24, 2012, Mrs. Markey emailed Maul asking if Maul had spoken to Mike

Delfino, owner of Delfino, and stating that she had met with an attorney who questioned whether

or not she should remain in her house.  *See* Mrs. Markey May 24, 2012 Email, Hrg. Ex. 11.  Mrs.

Markey testified that the attorney she referred to in this email was Barry Cohen, Esq.  *See* Mrs.

Markey Test., 3/23/15 Tr., at 30:14-15.  Maul responded to Mrs. Markey by email on May 25,

2012, stating, *inter alia*, that he believed it was safe for the Markeys to remain in their home,

particularly "the main part" of their home, because "[n]one of the results [or the air quality

testing] were extremely elevated and they will likely get less and less as time goes on."  Hrg.

Ex. 11.

Insight Environmental emailed Mrs. Markey a copy of an environmental analysis report

authored by Maul ("Maul Original Report" or "Original Report") on May 29, 2012.  *See* Insight

May 29, 2012 Email, Hrg. Ex. 13; Maul Original Report, Hrg. Ex. 12; Mrs. Markey Test.,

3/23/15 Tr., at 35:17-23.  The Original Report is dated May 25, 2012 and is signed by Maul.  *See*

Hrg. Ex. 12.  Mrs. Markey forwarded the Original Report to Attorney Cohen by email.  *See* Mrs.

Markey May 29, 2012 Email, Hrg. Ex. 13.

On July 25, 2012, Mrs. Markey emailed Maul stating that the Markeys' "new attorney

would like some more information included in your report, if this is possible."  Mrs. Markey July

29, 2012 Email, Hrg. Ex. 19.  The email goes on to state:

> The information he would like you to include we had discussed with
> you after you spoke with the lab, regarding how the elevated levels
> found . . . even though are within OSHA's permissible exposure
> limits etc. that we are a residence being exposed 24/7 so to speak.
> You wrote that the odor present appears to be a nuisance odor and
> should not negatively impact the health of anyone occupying the
> area.  The issue with that statement is that nobody knows the impact
> of these compounds as far as being exposed daily . . . for 24 hrs, nor
> is there a set exposure limit for home environments with many of
> these spray foam chemicals because they are not usually found in
> homes.  We have also been exposed during spraying as well and this
> leads to sensitization.  The other thing that I think should be included
> is that nobody knows how long this will take to off-gas[] completely.
> So the overall issue is that we need more of the 'what if's or
> unknowns' regarding the exposure/off-gassing to the spray foam
> included in the report that we spoke about.  Is this possible?  If there
> is anything I just stated that you disagree with and don't feel
> comfortable including in your report, please let me know what you
> think.  Thanks again!

*Id.*  Mrs. Markey testified at the hearing that the "new attorney" she referred to in this email was

her "family attorney" John Griffin, not MAR.  Mrs. Markey Test., 3/23/15 Tr., at 53:9-19.

Mrs. Markey further testified that the information she asked Maul to add to the report was based on information Maul had discussed with her during a telephone phone call after the lab results came in but before Maul submitted his Original Report.  *See id.* at 58:4-6; 4/16/15 Tr. 243:22-244:11, 244:22-245:2; *see also* Affidavit of Plaintiff Kristine Markey ("Markey Aff."), Hrg. Ex. 5, ¶¶ 20-22.  The Court finds this testimony credible.  Maul did not contradict this testimony, although he stated that he could not remember speaking with Mrs. Markey over the phone.  *See* Maul Test., 3/23/15 Tr., at 106:20-24; 115:7-10.

In response to Mrs. Markey's July 25, 2012 email, Maul made certain changes to the Original Report and emailed Mrs. Markey a revised version on July 26, 2012 ("Maul Revised Report" or "Revised Report").  *See* Maul Revised Report, Hrg. Ex. 20, Maul July 26, 2012 Email, Hrg. Ex. 19; *see also* Mrs. Markey Test., 3/23/15 Tr., at 58:8-16.  The pertinent changes reflected in the Revised Report are set forth below.  For the sake of clarity, the Court has placed the language which Maul added to the Revised Report in boldface type, and has drawn a line through the language which Maul removed from the Original Report.

> Analysis has revealed elevated levels of a variety of target compounds above the Reporting Limits (RL).  (Please see the highlighted results in Attachment A).  These compounds are solvents, carriers, propellants, and foam blowing agents all associated with foam insulation.
>
> ~~It should be noted that all of the compounds found to be present above the reporting limits are well below~~ **Regulated compounds detected above laboratory reporting limits are within established** OSHA²s permissible exposure limits (PELs), the American Conference of Governmental Industrial Hygienists (ACGIH) and the National Institute for Occupational Safety and Health (NISOH) recommended exposure limits (RELs).
>
> ~~Based on these findings, the odor present appears to be a nuisance odor and should not negatively impact the health of anyone occupying the area.~~ **It is noted that many of the compounds detected do not have dose response related exposure limits as**

> **established by OSHA, NIOSH or the ACGIH due to lack of epidemiological data and as such are un-regulated.**
>
> **We find it likely that concentrations during initial application and the ensuing 24-48 hours were substantially higher than those observed in the sampling battery discussed herein. These elevated concentrations are most attributable to your reported discomfort while taking occupancy within the home and the lingering odor. Furthermore, this exposure may have resulted in a chemical sensitivity where even a minute amount of the odor now will initiate a neurological response resulting in additional discomfort.**
>
> To aid in the removal of residual odor associated with off-gassing during the curing process, we recommend that additional ventilation be added to the newly built portion of the dwelling. We also recommend the use of air purifiers with activated charcoal carbon filters to scrub the air and neutralize the odor throughout the problem areas. Additional door neutralizers may be used in concert with the air purifiers.

Maul Revised Report, Hrg. Ex. 20. The Revised Report is also dated May 25, 2012 and is signed by Maul. *Id.*

Maul testified that, when he signed the Original Report, he intended it to be his final report and he did not plan to change the report until he received Mrs. Markey's July 25, 2012 email. Maul Test., 3/23/15 Tr., at 108:25-109:2,116:2-7. However, in Maul's view, Mrs. Markey "made some good points" in her email – points which Maul believed "were relevant," had been "overlooked in [his] initial report," and warranted inclusion in a revised version of the report. *Id.* at 115:13-15; 135:4-13. Maul testified that there was nothing in the Revised Report that he was "uncomfortable with" or that he disagreed with. *Id.* at 127:8-25. Maul further confirmed that the Revised Report "fairly and accurately" reported his findings of the air quality sample he took from the Markeys' home. *Id.*

Counsel for the parties spent some time questioning Maul during the hearing about the conclusions he reached in his reports and his qualifications to draw those conclusions. Notably,

Maul testified that he was not qualified to determine whether the elevated levels of volatile organic compounds ("VOCs") reported in the lab results were causing Mrs. Markey's reported discomfort. *Id.* at 120:8-17. Maul also did not know whether any of the chemicals listed in the lab results are associated with the SPF installed in the Markeys' home, or whether that SPF was off-gassing. *Id.* at 125:12-15; 140:16-20. Maul was never asked by the Markeys or their counsel to serve as an expert in Plaintiffs' lawsuit. *Id.* at 123:16-23. The Markeys also did not mention bringing a lawsuit when they contacted Maul. *Id.* at 136:12-18.

The Court also notes that, according to Mrs. Markey, Plaintiffs decided to pursue this litigation only after they received the results of air samples tested by Matrix Analytical Laboratories Inc. ("Matrix"). *See* Mrs. Markey Test., 4/7/15 Tr., at 254:16-17. These samples were collected by a different environmental engineering firm, RTP Environmental ("RTP"), which was recommended to Plaintiffs by Attorney Cohen because "th[e]y are experienced with spray foam." *See id.* at 247:18-22. According to the Matrix lab reports, the air samples taken inside the addition to Plaintiffs' home showed elevated levels of VOCs, including "two (2) compounds that are directly related to compounds detected in off-gassing tests that were performed on the spray foam insulation." *See* Matrix Report, dated Aug. 4, 2012, Hrg. Ex. 21. The Matrix reports further note that one of those compounds – Tris (2-Chloroisopropyl) Phosphate – "is the fire retardant that is in the foam," "is semi-volatile," and "will remain inside the room for a very long time (years) if not removed." *Id.* Plaintiffs disclosed the Matrix reports to Lapolla in their Rule 26(a) Initial Disclosures. *See* Plaintiffs' Rule 26(a) Initial Disclosures ("Initial Disclosures"), Hrg. Ex. 24.

Moreover, at MAR's suggestion, Plaintiffs retained an expert, Bernie Bloom, who, according to Mrs. Markey, "is a spray foam expert and can pretty much speak on that behalf."

Mrs. Markey Test., 4/6/15 Tr., at 258:4-17.  Bloom came to Plaintiffs' home and took dust and air samples which he sent to Matrix to be tested.  *See id.* at 260:1-16.  Bloom ultimately made a report of his findings which he submitted to another of Plaintiffs' experts, Dr. Grace Ziem, M.D., to review.  *See id.* at 277:14-17; *see* Bloom Report, annexed as Ex. O to Markey Aff., Hrg. Ex. 5. However, Bloom's report was not produced during discovery in this case.  *See* Mrs. Markey Test., 4/6/15 Tr., at 278:4-5.

### B.    Plaintiffs' Document Production

The Court finds that certain essential facts concerning Plaintiffs' document production are not in dispute.  First, Plaintiffs did not disclose the Original Report and the various emails exchanged between Maul and Mrs. Markey in their Rule 26(a) Initial Disclosures, which were served on May 3, 2013.  *See* Hrg. Ex. 24; *see also* Mrs. Markey Test, 3/23/15 Tr., at 36:18-21; Hearing Testimony of David Sirotkin, Esq. ("Sirotkin Test."), 4/6/15 Tr., at 350:1-4.  Second, Plaintiffs did not produce these documents in their August 22, 2013 responses to Lapolla's first request for production.  *See* Plaintiff's Responses to LaPolla's Requests ("Plaintiffs' Responses"), Hrg. Ex. 28; *see* Sirotkin Test., 4/6/15 Tr., at 350:1-351:11; 359:24-360:3.  Third, Attorney Sirotkin signed the certification for both the Initial Disclosures and the responses to the document requests.  *See* Hrg. Exs. 24 & 28.

In light of these facts, the parties attempted to explore during the hearing why the Plaintiffs did not produce the Original Report and the referenced emails.  Both Plaintiffs testified that, before they had any contact with MAR, they provided documents to the Law of Office of Wolf & Pravato ("the Pravato Firm") in Fort Lauderdale, Florida, shortly after retaining the firm in August 2012.  *See* Mrs. Markey Test, 3/23/15 Tr., at 54:5-6.  MAR and the Pravato Firm worked on Plaintiffs' case together, but the firms are not affiliated.  *See* Sirotkin Test., 4/6/15

Tr., at 314:315.  Plaintiffs testified that the Pravato Firm asked them to send over whatever documents they had, and within a few weeks, they began submitting documents.  *See* Mrs. Markey Test, 3/23/15 Tr., at 54:20-25; 55:20-21; Mr. Markey Test., 4/6/15 Tr., at 411:11-412:3-18.

Neither of the Plaintiffs could remember all the documents they sent to the Pravato Firm.  *See* Mr. Markey Test., 4/6/15 Tr., at 411:16-18 Mrs. Markey Test, 3/23/15 Tr., at 55:1-5.  However, Mrs. Markey testified that, although she was "not a hundred percent sure," she believed she sent the Pravato Firm a copy of the Revised Report, but not the Original Report.  Mrs. Markey Test, 3/23/15 Tr., at 55:3-5, 55:23-56:3.  When asked at the hearing why she made "the conscious decision" to send the Revised Report, rather than the Original Report, Mrs. Markey stated:  "Because one was reflective of what actually happened and the other wasn't what was originally discussed."  *Id.* at 55:16-19.  Mrs. Markey further testified during the hearing that:  "George Maul's original report was not reflective of what he had spoken with me about regarding the last lab finding.  And when he had consulted with them [it] was a lot different from the actual report that he originally rendered.  The report was supposed to be based upon our conversations and findings."  *Id.* at 55:7-12.  As noted, however, Maul testified that he could not recall if he had such a conversation with Mrs. Markey.  Maul Test., 3/23/15 Tr., at 115:7-10.

Attorney Sirotkin was the only attorney at MAR who communicated directly with the Markeys concerning their document production.  *See* Hearing Testimony of David Ratner, Esq. ("Ratner Test."), Transcript of April 17, 2015 Hearing ("4/17/15 Tr."), at 445-24-445:1.  However, Attorney Ratner testified that he supervised Attorney Sirotkin and that he oversaw "all

communications with the Markeys," including those initiated by Attorney Sirotkin and his paralegal, Greg Shuster.  *See id.* at 444:19-21, 445:4-14.

MAR first contacted the Markeys about gathering documents around February 18, 2013, when Attorney Sirotkin emailed Mr. Markey after speaking with him on the phone.  *See* Sirotkin Feb. 18, 2013 Email, Hrg. Ex. 23; Markey Aff., Hrg. Ex. 5, ¶ 37.  In his email, Attorney Sirotkin asked Mr. Markey to provide "the indoor air quality test results," as well as Mrs. Markey's medical records, the costs associated with the insulation remediation of the SPF, "and other information that you think would be useful."  Hrg. Ex. 23.  However, Attorney Sirotkin also noted in his email that he had "already been sent a number of documents from Vince [Pravato] so don't feel as though you need to send us everything you have."  *Id.*  Attorney Sirotkin testified that this comment was intended to convey that Plaintiffs should "send [MAR] additional documents that you hadn't already sent Vince [Pravato]."  Sirotkin Test., 4/6/15 Tr., 336:9-13.

Mrs. Markey testified that she could not recall what documents, if any, she sent in response to Attorney Sirotkin's February 18, 2013 email.  Mrs. Markey Test., 3/23/15 Tr., at 81:22-82:2, 84:18-23.  However, she did not believe she informed Attorney Sirotkin about the Original Report because Plaintiffs gave MAR a copy of "what [they] thought would be the final report," namely, the Revised Report.  *Id.* at 82:24-83:6.  When asked at the hearing why she did not send the Original Report to MAR when she had sent that document to her former attorney, Barry Cohen, Mrs. Markey stated:  "[b]ecause that was not the final report."  *Id.* at 85:16-19.  However, Mrs. Markey testified that she did not "deliberately hide" the Original Report from either MAR or Lapolla.  *See* Mrs. Markey Test., 4/6/15 Tr., at 273:14-19.

Mrs. Markey further testified that she did not provide MAR with the emails she exchanged with Maul because she "didn't even know [the emails] w[ere] discoverable."  Mrs.

Markey Test., 3/23/15 Tr., at 26:6.  According to Mrs. Markey, neither the Pravato Firm nor

MAR asked her to gather and produce emails she exchanged with professionals such as Maul.

*Id.* at 26:7-9; 34:23.  Accordingly, Mrs. Markey never made an effort to delete or take the emails

off of her computer because she "didn't know that [she] had to," *id.* at 34:21, and her "lawyers

did not ask for them," *id.* at 36:24-37:3.

On August 12, 2013, Attorney Sirotkin emailed Mr. Markey a copy of Lapolla's 144

document requests.  *See* Sirotkin Email, dated Aug. 12, 2013, Hrg. Ex. 27.  As relevant to the

instant motion, Lapolla's requests directed the Plaintiffs to produce:  (1) all communications

between any of the Plaintiffs and Insight Environmental and/or Maul, (2) all documents provided

by Insight Environmental and/or Maul to Plaintiffs, and (3) all documents provided by Plaintiffs

to Insight Environmental and/or Maul.  *See* Lapolla's Request for Production of Documents,

Hrg. Ex. 28, at 16.  In his email to Mr. Markey, Attorney Sirotkin noted that many of Lapolla's

requests "are either duplicative, irrelevant, or improper."  Hrg. Ex. 27. Attorney Sirotkin asked

Mr. Markey to "read these requests over, see what documents you are requested to produce, and

begin gathering them."  *Id.*  Attorney Sirotkin represented that either he or his paralegal, Greg

Schuster, would speak with Plaintiffs over the phone "to go over the requests."  *Id.*

Attorney Sirotkin testified that his paralegal, Greg Schuster, merely "assisted" him in

gathering documents from the Markeys.  *See* Sirotkin Test., 4/6/15 Tr., 341:9-12.  However, it

appears to the Court that Greg Shuster was the individual at MAR who had the most consistent

contact with the Markeys during this process.  Between August 13, 2013 and August 21, 2013,

Shuster sent Plaintiffs multiple emails asking them to provide documents in response to

Lapolla's requests.  *See* Shuster Emails, annexed as Ex. I to Markey Aff., Hrg. Ex. 5.  Mrs.

Markey testified that she never spoke to Attorney Sirotkin about Lapolla's document requests

and "[p]retty much" just exchanged emails with Greg Shuster.  Mrs. Markey Test., 4/6/15 Tr.,

213:16-21.  In fact, Mrs. Markey stated that it would be "fair to say" that she dealt primarily with

Mr. Shuster "in terms of trying to comply with the request for production."  *Id.* at 223:24-224:2.

Mrs. Markey admitted that she personally did not read each specific document request

"and check off what was in or out."  *Id.* at 218:13-22.  However, her communications with Greg

Shuster led her to assume that, if MAR needed something specific from her, the firm would ask

for it.  *See id.* 213:1-5. Mrs. Markey further stated that, unless Greg Shuster asked for a certain

document, she "wouldn't have realized or [she] wouldn't have known what [she] needed to

produce."  *Id.* at 213:6-10.

To that end, both Mr. and Mrs. Markey testified that neither Attorney Sirotkin nor anyone

from MAR reviewed Lapolla's specific document requests with them or explained what types of

information would be relevant and responsive to those requests.  *See id.* at 213:22-214:4; Mr.

Markey Test., 4/17/15 Tr., at 420:18-421:1.  In particular, according to the Markeys, no one at

MAR (1) reviewed their discovery responses with them to ensure that they were complete

(2) gave them instructions about their overall discovery obligations; (3) described to them what

constitutes a document or explained the concept of preservation; or (4) explained that drafts were

required to be produced pursuant to the definitions listed in Lapolla's request for production.

Mrs. Markey Test, 4/6/15 Tr., at 214:16-20; 215:13-216:17; Mr. Markey Test., 4/17/15 Tr., at

420:18-422:12.  The Markeys also testified that MAR never asked them if they had relevant

emails or if they should provide any emails in response to Lapolla's requests.  *See* Mrs. Markey

Test, 3/23/15 Tr., at 26:3-9; Mr. Markey Test., 4/17/15 Tr., at 420:13-17.  The Court finds the

Markeys' testimony on this issue to be credible.

Attorney Sirotkin and Attorney Ratner testified that, in their view, MAR's supervision of discovery was reasonable under the circumstances.  Attorney Ratner noted that MAR "had been in constant communication with the [Markeys], both through e-mail and on the telephone, both through lawyers and paralegals."  Ratner Test., 4/17/15 Tr., at 450:1-3.  When asked whether he had "any understanding as to whether the Markeys had any experience such as the prior lawsuit in responding to discovery requests," Attoreny Ratner replied:  "We had an understanding that the Markeys knew how to read English, and we worked on that assumption like we do with all of our relatively sophisticated and relatively involved clients, and the Markeys were very involved in all aspects of this lawsuit."  *Id.* at 449:10-17.  Attorney Sirotkin testified that he "believe[d] that [Lapolla's] request for production was pretty self-explanatory," Sirotkin Test., 4/6/15 Tr., at 344:19-23, and that MAR had, in essence, made clear to Plaintiffs what their discovery obligations were by sending Plaintiffs the requests and following up with specific requests, *id.* at 345:7-10.  Attorney Sirotkin further noted that MAR had no reason to believe Plaintiffs had not complied with the requests, which clearly asked for all communications between Plaintiffs and Maul.  *Id.* at 364:24-365:9.  Attorney Sirotkin also emphasized that Plaintiffs never sent them a copy of the Original Report, and he therefore was not aware that it existed.  *Id.* at 365:15-17.

However, Attorney Sirotkin's testimony also revealed certain steps MAR did not take during discovery.  In particular, Attorney Sirotkin testified that, although some of the documents Plaintiffs produced were printed from Mrs. Markey's email account, he never "personally searched" Mrs. Markey's account to ensure that Plaintiffs' production was complete.  Sirotkin Test., 4/6/15 Tr., at 343:1-14.  Attorney Sirotkin also did not contact Maul or anyone at Insight Environmental to determine if they had relevant documents in addition to the Revised Report, which MAR received from the Pravato Firm.  *Id.* at 337:16-18, 343:15-21.  And although

Attorney Sirotkin stated in his August 12, 2013 email to Mr. Markey that some of Lapolla's requests were "duplicative, irrelevant, or improper," Hrg. Ex. 27, he never told Plaintiffs which requests he thought were improper.  Sirotkin Test., 4/6/15 Tr., at 339:20-25; Mr. Markey Test., 4/17/15 Tr., at 422:18-423:3. When asked whether Attorney Sirotkin's comment about the impropriety of Lapolla's requests had any impact on the Plaintiffs' efforts to produce documents, Mr. Markey responded "absolutely," explaining:  "[Y]ou're trusting somebody to take your case and give them the information that they need and you comply with what they need.  And when he said that, we really never read the 180 items that [Lapolla] wanted.  We thought that was [MAR's] job to tell us what they needed, as we sent them."  Mr. Markey Test., 4/17/15 Tr., at 423:20-424:7.

Although Plaintiffs did not produce the Original Report in their Initial Disclosures or discovery responses, Lapolla received a copy of the Original Report on October 7, 2013 in response to a subpoena it served on Insight Environmental.  *See* Subpoena, Hrg. Ex. 31; *see* Sirotkin Test., 4/6/15 Tr., at 347:9-348:6.  Lapolla subsequently served a copy of the Original Report on MAR.  *See* Sirotkin Test., 4/6/15 Tr., at 347:9-348:6.

Despite having received the Original Report in October 2013, Plaintiffs did not supplement their discovery responses to include a copy of that report.  *Id.* at 350:1-351:11.  In fact, according to Attorney Sirotkin's testimony at the hearing, MAR took virtually no action upon its receipt of the Original Report.  *See id.*  In particular, Attorney Sirotkin never contacted Maul or the Markeys in order to learn more about this report once he received it, nor did he contact Maul to inquire whether Maul had additional documents beyond what Plaintiffs accounted for in their Initial Disclosures and discovery responses.  *Id.*  Attorney Sirotkin further

testified that receiving the Original Report did not prompt him to examine Plaintiffs' computer to determine if the Markeys had any related communications. *Id.*

However, Attorney Ratner testified that, although it may have been an "oversight" on MAR's part, the firm was not aware when it received the Original Report that the document was different from the Revised Report. Ratner Test, 4/17/15 Tr., at 455:2-8. Indeed, Attorney Sirotkin testified that he did not realize Maul had revised the Original Report until Maul "discussed it during his deposition." Sirotkin Test., 4/6/15 Tr., at 365:14-15. Therefore, according to MAR, the firm did not intentionally fail to disclose the Original Report or otherwise try to "pull anything over on Lapolla." Ratner Test, 4/17/15 Tr., at 455:8-9.

As for the emails between Maul and Mrs. Markey, neither Lapolla nor MAR received these documents until they were produced by Maul during and in the days immediately following his deposition on April 23, 2014. *See* Maul Emails, Hrg. Exs. 35-37; *see also* Sirotkin Test., 4/6/15 Tr., at 351:12-25, 356:9-12. Notably, the July 25, 2012 email in which Mrs. Markey requested that Maul change his Original Report was not disclosed until April 26, 2014, after Lapolla had already taken Maul's deposition. *See* Hrg. Ex. 37. MAR filed its motion to withdraw as counsel two days later on April 28, 2014. *See* DE 76.

### C. Personal Injury Claims Asserted in This Action

As discussed, Plaintiffs filed three pleadings in this action: the Original Complaint, the Amended Complaint, and the SAC. The Original Complaint and SAC are signed by Benedict P. Morelli, Esq., of the New York-based law firm Morelli Ratner P.C. ("Morelli Ratner"). *See* Compl. at 23; SAC at 23. The following attorneys are also listed in these pleadings as counsel for Plaintiffs: (1) Attorney Ratner and Attorney Sirotkin, also from Morelli Ratner; (2) David C. Rash, Jeremy W. Alters, and Matthew T. Moore of the Florida-based Alters Law Firm, P.A.

("the Alters firm"); and (3) the Pravato Firm. *Id.* at 23-24. The Amended Complaint is signed by Attorney Sirotkin and lists the aforementioned attorneys as counsel for Plaintiffs. *See* Am. Compl. at 31. At some point during this litigation, Morelli Ratner and the Alters firm merged to become MAR. *See* Sirotkin Test., 4/6/15 Tr., at 313:20-21.

The parties devoted a significant amount of time during the hearing to addressing the personal injury claims asserted in the pleadings. Having considered the pleadings and the evidence adduced at the hearing, the Court, at the outset, makes the following findings. First, all three pleadings in this action assert personal injury claims on behalf of both of the Markeys. Second, at the time the pleadings were filed, neither MAR nor Plaintiffs were in possession of any medical evidence connecting Mrs. Markey's alleged personal injuries to Lapolla's SPF. *See* Mrs. Markey Test., 4/6/15 Tr., at 174:10-12; 175:24-176:6; 185:2-15. Specifically, Mrs. Markey sought treatment from two doctors prior to commencing this action – her internist, Dr. Susan Lee, M.D., and a neurologist, Dr. Rahman Pourmand, M.D. – and neither doctor made "any findings that [Mrs. Markey] had any injuries [which] correlated to the spray foam." Mrs. Markey Test., 3/23/15 Tr., at 28:3-5; *see id.* 41:21-23, 46:8-10; *see also* Medical Records of Dr. Lee and Dr. Pourmand, Hrg. Exs. 46-47. Third, Mr. Markey never sought treatment from a doctor or any medical professional for SPF-related injuries. *See* Mrs. Markey Test, 3/23/15 Tr., at 79:3-6, 4/6/15 Tr., at 186:2-17.

Both Mr. and Mrs. Markey repeatedly testified that they were not aware that personal injury claims were being asserted in the pleadings and that they did not authorize their attorneys to raise those claims on their behalf. *See* Mrs. Markey Test., 4/6/15 Tr., at 158:12-23, 170:18-171:5, 195:15-22; Mr. Markey Test., 4/17/15 Tr., at 414:4-7, 415:13-20, 419:23-25l 402:1-3. Rather, Plaintiffs testified that it was their understanding that they were only seeking to recover

for property damage and to receive medical monitoring – or, at least, that is what their attorneys told them. *See* Mrs. Markey Test., 3/23/15 Tr., at 48:12-13, 19-20; 49:8-15; 50:15, 78:13-14; 4/16/15 Tr., at 158:12-23, 165:6-11, 166:1-19, 169:11-16, 171:10-11. Mrs. Markey emphasized that, although she was "extremely ill" and her doctors "had no clue" what the chemicals she was exposed to "were or what they did," she did not believe asserting a personal injury claim "was reasonable considering we didn't have [medical] documentation." Mrs. Markey Test., 3/23/15 Tr., at 51:1-5; *see* Mrs. Markey Test., 4/6/15 Tr., at 161:22-163:3. The Court finds the testimony or Mr. and Mrs. Markey credible on this issue.

Attorney Ratner disputed Plaintiffs' assertions that they were not aware that MAR filed personal injury claims on their behalf. *See* Ratner Test., 4/17/15 Tr., at 460-13:19. However, despite what Plaintiffs' allegedly understood about the claims which were asserted in this action, Attorney Ratner testified that MAR was "authorized to proceed on behalf of the Markeys pursuant to the retainer that was signed by the Markeys with Mr. Pravato . . . and, therefore, [the Markeys] approved of us asserting all claims that they had as a result of SPF exposure on their behalf." Ratner Test., 4/17/15 Tr., at 461:21-24.

Attorney Sirotkin and Attorney Ratner also defended MAR's decision to seek recovery for personal injury claims in this action. In particular, both testified that, prior to filing the Original Complaint, MAR learned from the Pravato Firm that both of the Markeys "were experiencing discomfort and injury as a result of what they thought was the spray foam," and that VOCs had been detected in their home. Ratner Test., 4/17/15 Tr., at 444:4-6; *see* Sirotkin Test., 4/6/15 Tr., at 366:20-25. Based on this information– as well as general knowledge MAR gleaned from its experience working on other SPF-related cases, *see* Ratner Test., 4/17/15 Tr., at 467:9-13 – MAR "concluded that the [Markeys] were both experiencing and prone to experience

further personal injuries living in th[eir] home." Sirotkin Test., 4/6/15 Tr., at 367:22-368:2. Attorney Ratner further noted that MAR was "confident" about asserting personal injury claims in the Markeys' case because he "knew that Kristine Markey w[as] suffering some very serious possible neurological problems." Ratner Test., 4/17/15 Tr., at 456:19-21. Attorney Ratner also "kn[e]w that Mr. Markey was feeling some ill effects of the SPF and, therefore, in our belief there was a good faith basis for asserting a personal injury case on his behalf when we asserted it." *Id.* at 461:2-5.

At MAR's suggestion, Mrs. Markey was examined by a chemical specialist, Dr. Grace Ziem, M.D., in December 2013. *See* Mrs. Markey Test, 4/6/15 Tr., 196:14, 197:6-8. It is undisputed that MAR retained Dr. Ziem as an expert with the hope that she would establish a link between Mrs. Markey's injuries and Lapolla's SPF. *See id.* at 197:6-8. It is also undisputed that Dr. Ziem produced an expert report based on her evaluation in which she diagnosed Mrs. Markey as suffering from injuries related to SPF. *See* Dr. Ziem Report, Hrg. Ex. 33. Dr. Ziem's report concludes that Mrs. Markey "has suffered serious permanent sensitization and ongoing health effects as a result of the application of an inherently dangerous product, spray foam insulation." *Id.* at 10. In particular, the report diagnoses Mrs. Markey as suffering from, *inter alia*, "toxic encephalopathy," "reactive airway disease involving the upper respiratory tract," and "recurring hypoxia in the brain . . . causing risk of toxic-induced stroke, as a complication of her toxic encephalopathy." *Id.* at 7. The report states that theses "diagnoses . . . are a consequence of [Mrs. Markey's] exposure to toxic isocyanates and other chemical mixtures, and the particulate exposure of the spray foam insulation." *Id.* The report notes that Dr. Ziem's statements "are within reasonable medical certainty with the knowledge available to [her]." *Id.* at 11.

### D.   MAR's Decision to Withdraw as Counsel

Around April 19, 2014, Plaintiffs received a letter from Attorney Sirotkin which urged

Plaintiffs "to drop [the] case in view of the testimony of Drs. Lee and Pourmand which did not

connect [Mrs. Markey's] symptoms with the SPF and another matter unrelated to this incident

which concerned [Attorney Sirotkin]."  Markey Aff., Hrg. Ex. 5, ¶ 57.  Plaintiffs received

another letter from Attorney Sirotkin on April 28, 2014 which stated that, if Plaintiffs did not

dismiss the case, MAR would withdraw as their counsel of record.  *Id.* ¶ 58.  That same day,

MAR filed a motion before Judge Seybert seeking to withdraw as counsel for Plaintiffs.  DE 76.

Mrs. Markey testified that she and Mr. Markey were "shocked" and "not happy" at

MAR's decision to withdraw in light of the fact that Dr. Ziem had connected Mrs. Markey's

injuries to the SPF.  *See* Mrs. Markey Test., 4/6/15 Tr., at 204:24, 297:18.  However, Mrs.

Markey also testified that, during the hearing before Judge Seybert on MAR's motion to

withdraw, she agreed to MAR being relieved as counsel.  *Id.* at 308:2-14.

Attorney Ratner testified that "[t]here were many factors" that went into MAR's decision

not to proceed with the Markeys' lawsuit and to withdraw as counsel.  Ratner Test., 4/27/15 Tr.,

at 562:17-18.  MAR did not withdraw "because we thought it was a frivolous litigation" or

"because we thought it was a litigation without merit."  *Id.* at 559:12-14.  Rather, Attorney

Ratner explained:

> [A]s lawsuits proceed, [MAR had] to weigh, because we are a
> contingency fee firm, whether or not there is a likelihood of success
> in the case, and based on certain things that we learned about Mr.
> Markey and Mrs. Markey that had not been put in the record and we
> can't put in the record, and based on our assessment of all of the
> issues in the case, and based on the continued costs of litigating it,
> although we felt that we could survive a motion for summary
> judgment, we felt that the prudent thing to do was, rather than
> continue the litigation, suggest to the Markeys that the litigation be
> discontinued.

> And when they wouldn't do that, we had a fundamental disagreement with them on the further course of the litigation. We asked Judge Seybert to relieve us as their lawyers and then Mr. Purcell was hired.  It was because we weighed certain factors and decided that prudence for us and the Markeys was not to pursue it further.

*Id.* at 558:18-559:8.  Attorney Ratner also testified that Plaintiffs' environmental engineering expert, Bernie Bloom, "was very ill" and "[MAR] had issues and considerations about whether or not he would be able to come and testify, whether we would have to obtain new experts, whether we would have to go through a whole rigmarole to get [Plaintiffs'] house retested."  *Id.* at 562:21-563:1.  MAR also "did not think Mr. Maul or anyone else who looked at the house had enough expertise to support a claim that the VOCs were sufficiently dangerous enough to support the case."  *Id.* at 563:2-5.

Ultimately, Attorney Ratner testified:

> We were concerned about the ongoing costs of the litigation. We were concerned about the ongoing time of the litigation. We were concerned about how our resources as a contingency fee firm were going to be spent.  And we felt that because of those considerations, and because of the fact that we would have to, in essence, cross-examine the two treating doctors for Mrs. Markey, that a more prudent thing for my firm to do, and for the Markeys to do, would be to not throw good money after bad and let the litigation end.

*Id.* at 563:6-15.

## IV.   CONCLUSIONS OF LAW

### A.   Discovery Sanctions Pursuant to Rule 26(g) and Rule 37(c)

In its motion, Lapolla argues that MAR and Plaintiffs should be sanctioned under Rules 37(c) and 26(g)(3) for failing (1) to disclose Maul's Original Report in Plaintiffs' Rule 26(a) Initial Disclosures; (2) to disclose the Original Report, as well the email communications

between Mrs. Markey and George Maul, in response to Lapolla's discovery requests; and (3) to supplement their discovery responses with the aforementioned documents.

### 1.   *Applicable Legal Standards*

#### a.   **Rule 26 Obligations**

Rule 26(a)(1) requires that, at the outset of the litigation, each party must provide to the other parties "a copy—or description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii). "A party must make its Initial Disclosures based on the information then reasonably available to it," but it "is not excused from making its disclosures because it has not fully investigated the case." Fed. R. Civ. P. 26(a)(1)(E).

Moreover, "Rule 26(g) charges all attorneys with a special, 'affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes' of liberal discovery." *Kosher Sports, Inc. v. Queens Ballpark Co., LLC*, No. 10-CV-2618, 2011 WL 3471508, at *7 (E.D.N.Y. Aug. 5, 2011) (quoting Fed. R. Civ. P. 26(g) advisory committee's note to 1983 amendment); *see, e.g.*, *Quinby v. WestLB AG*, No. 04-CV-7406, 2005 WL 3453908, at *4 (S.D.N.Y. Dec. 15, 2005). Accordingly, Rule 26(g) requires that "[e]very disclosure under Rule 26(a) (1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name." Fed. R. Civ. P. 26(g)(1).

> By signing a response to a discovery request, an attorney certifies that to the best of her 'knowledge, information, and belief formed after a reasonable inquiry,' the response is (1) consistent with the Federal Rules of Civil Procedure and justified under existing law; (2) not interposed for any improper purpose, such as to unnecessarily delay or needlessly increase the costs of litigation; and

> (3) reasonable given the importance of the issue and the circumstances of the case.

*Kiobel v. Royal Dutch Petroleum Co.*, No. 02-CV-7618, 2009 WL 1810104, at *2 (S.D.N.Y.

June 25, 2009) (quoting Fed. R. Civ. P. 26(g)(1)); *see, e.g.*, *Ritchie Risk-Linked Strategies*

*Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 157 n.2 (S.D.N.Y. 2012);

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023, 2010 WL 3173785, at *3 n.3

(E.D.N.Y. Aug. 11, 2010).

   An attorney has made a "reasonable inquiry" under Rule 26(g) "if the 'investigation

undertaken by the attorney and the conclusions drawn therefrom are reasonable under the

circumstances.  Ultimately, what is reasonable is a matter for the court to decide on the totality of

the circumstances.'"  *Quinby*, 2005 WL 3453908, at *4 (quoting Fed. R. Civ. P. 26(g) advisory

committee's note to 1983 amendment) (internal quotation marks and alteration omitted).  In

making a reasonable inquiry, "an attorney may rely, when appropriate, on representations by her

client or by other attorneys."  *Kiobel*, 2009 WL 1810104, at *2.  "Furthermore, 'Rule 26(g) does

*not* require the signing attorney to certify the truthfulness of the client's factual responses to a

discovery request.'"  *Id.* (quoting Fed. R. Civ. P. 26(g) advisory committee's note to 1983

amendment) (emphasis in original).  However, "[a]s officers of the court, all attorneys

conducting discovery owe the court a heightened duty of candor."  *Kosher Sports*, 2011 WL

3471508, at *7 (citing *United States v. Gotti*, 322 F. Supp. 2d 230, 236–38 (E.D.N.Y. 2004)).

### b.      Sanctions for Failure to Comply with Rule 26 Obligations

   Several provisions of the Federal Rules of Civil Procedure authorize a court to impose

sanctions for untimely, incomplete, or misleading responses during discovery.  Here, Lapolla

requests that Plaintiffs and MAR be sanctioned pursuant to Rule 37(c) and Rule 26(g)(3).  *See*

Lapolla Mot. ¶¶ 62-73.

### i.     <u>Rule 37(c) Sanctions</u>

Pursuant to Rule 37(c), a court may impose sanctions in the event of party's failure to disclose, to supplement an earlier response, or to admit as required by Rule 26(a) or (e), "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Rule permits a court to impose a variety of sanctions for discovery-related abuses, including "[the] payment of the reasonable expenses, including attorney's fees." *Id.* Where, as here, "the alleged misconduct is the non-production of relevant documents, district courts have broad discretion in fashioning an appropriate sanction." *Fossil Indus., Inc. v. Onyx Specialty Papers, Inc.*, 302 F.R.D. 288, 293 (E.D.N.Y. 2014) (citing *Creative Resources Group of New Jersey v. Creative Resources Group, Inc.*, 212 F.R.D. 94, 102 (E.D.N.Y. 2002)); *see also Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 135 (2d Cir. 2007) ("[D]istrict courts possess 'wide discretion' in imposing sanctions under Rule 37." (internal citation omitted)). "The party seeking Rule 37 sanctions bears the burden of showing that the opposing party failed to timely disclose information." *A.V.E.L.A., Inc. v. Estate of Monroe*, No. 12-CV-4828, 2014 WL 715540, at *4 (S.D.N.Y. Feb. 24, 2014) *adhered to on reconsideration*, 2014 WL 1408488 (S.D.N.Y. Apr. 11, 2014) (citing *Lodge v. United Homes, LLC*, 787 F. Supp. 2d 247, 258 (E.D.N.Y. 2011)); *accord In re Sept. 11 th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) ("The moving party bears the burden of showing that its adversary failed timely to disclose information required by Rule 26.").

When seeking sanctions for failure to produce discovery, the moving party must demonstrate: "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a

reasonable trier of fact could find it would support that claim or defense." *In re Sept. 11 th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125 (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)); *accord A.V.E.L.A.*, 2014 WL 715540, at \*4 (quoting *Valentini v. Citigroup, Inc.*, No. 11-CV-1355, 2013 WL 4407065, at \*2 (S.D.N.Y. Aug. 16, 2013)). "To satisfy the first element of this test, the moving party must show that the respondent breached its obligations, either as set forth in Rule 26 . . . or as provided in court orders regulating discovery." *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125.

"The 'culpable state of mind' element is satisfied by a showing that 'a party has breached a discovery obligation . . . through bad faith or gross negligence [or] ordinary negligence.'" *Id.* (quoting *Residential Funding*, 306 F.3d at 113) (citing *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) ("Since Rule 37(c)(1) by its terms does not require a showing of bad faith, we now hold that such a requirement should not be read into the Rule.")); *see, e.g.*, *Fossil*, 302 F.R.D. at 293 ("A culpable state of mind includes the knowing or negligent failure to produce evidence." (internal quotations marks and alteration omitted)); *A.V.E.L.A.*, 2014 WL 715540, at \*4 ("To establish culpability, all that is required is negligence leading to a breach of a discovery obligation."); *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 41 (S.D.N.Y. 2010), *opinion adopted*, 271 F.R.D. 55 (S.D.N.Y. 2010) ("In the Second Circuit, negligence is sufficient to establish culpability."). Failures to produce relevant evidence "occur along a continuum of fault-ranging from innocence through the degrees of negligence to intentionality,'" and courts must therefore take a "case-by-case approach" in determining the level of culpability. *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)). "'In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and

fairly in the discovery phase of a judicial proceeding." *In re Pfizer Secs. Litig.*, 288 F.R.D. 297,

314 (S.D.N.Y. 2013) (internal quotations omitted); *accord Harkabi v. SanDisk Corp.*, 275 F.R.D.

414, 418-19 (S.D.N.Y. 2010)).  A party is negligent even if the failure "results from a pure heart

and an empty head." *In re Pfizer*, 288 F.R.D. at 314

    With respect to the relevance element, the standard of proof depends on the level of

culpability.  *See In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125.  "[A] finding that

a party breached its discovery obligations in bad faith is sufficient to establish the relevance of

untimely produced or destroyed evidence as a matter of law; a finding that a party breached its

obligations through gross negligence is 'frequently' sufficient." *Id.* (quoting *Residential

Funding*, 306 F.3d at 109).  "Where the breach of discovery obligations was merely negligent,

the term 'relevant' in the context of Rule 37 'means something more than sufficiently probative

to satisfy Rule 401 of the Federal Rules of Evidence.'" *Id.* (quoting *Residential Funding*, 306

F.3d at 108).  That is, the evidence must be such that "a reasonable trier of fact could find that it

would support that claim or defense.'" *Id.* (quoting *Residential Funding*, 306 F.3d at 107); *see

Lodge*, 787 F. Supp. 2d at 259.[4]

    However, the imposition of sanctions for the untimely production of documents should

not result in a "windfall for uncovering evidence that would have made little difference in the

---

[4]     The Court points out that the Committee on the Federal Rules of Civil Procedure has
proposed new rules to become effective December 2015 which will scale back some of the more
stringent guidance offered in *Residential Funding*.  Indeed, the Advisory Committee notes to the
new Federal Rule of Civil Procedure 37(e) state in part that this new rule: "rejects cases such as
*Residential Funding* . . . that authorize the giving of adverse-inference instructions on a finding
of negligence or gross negligence.  Adverse inference instructions were developed on the
premise that a party's intentional loss or destruction of evidence to prevent its use in litigation
gives rise to a reasonable inference that the evidence was unfavorable for the party responsible
for loss  or destruction of the evidence.  Negligent or even grossly negligent behavior does not
logically support that inference."  Advisory Committee Notes to Fed. R. of Civ. P. 37(e),
effective Dec. 1, 2015.

underlying case." *Id.* (describing the difference between "[t]he standard of relevance" for "evidence that was destroyed" versus "evidence that was untimely produced."); *see Nycomed*, 2010 WL 3173785, at *10.  "[W]here, as here, . . . the evidence at issue was not destroyed but untimely produced, [and] an assessment of relevance is possible[,] . . . the negligent party should sustain liability for breaching its discovery obligations [only] where such breach causes injury[.]"  *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125.

Moreover, "courts may not impose sanctions under Rule 37(c)(1) where a party's failure to comply was 'substantially justified' or where the conduct was 'harmless.'"  *Ritchie Risk*, 280 F.R.D. at 158-59 (citing Fed. R. Civ. P. 37(c)(1)).  "Substantial justification may be demonstrated where there is justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request, or if there exists a genuine dispute concerning compliance."  *Id.* at 159 (internal quotation marks omitted); *see, e.g.*, *Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, No. 99-CV-0275, 2004 WL 1811427, at *24 (S.D.N.Y. Aug. 12, 2004) ("The test of substantial justification is satisfied 'if there exists a genuine dispute concerning compliance." (internal quotation marks omitted)).  "Harmlessness means an absence of prejudice to the defendant."  *Ritchie Risk*, 280 F.R.D. at 159 (internal quotation marks and alteration omitted).  "The burden of proving either substantial justification or harmlessness rests with the party which has failed to disclose information."  *Kara Holding*, 2004 WL 1811427, at *24; *Ritchie Risk*, 280 F.R.D. at 159.

### ii. Rule 26(g)(3) Sanctions

"Rule 26(g) is intended to deter and curb discovery abuses, including evasive responses, by explicitly encouraging the imposition of sanctions."  *Kiobel*, 2009 WL 1810104, at *2 (internal quotation marks omitted).  Rule 26(g)(3) therefore provides that if an attorney's

certification violates Rule 26(g)(1) "without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3). The sanction for this violation "may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." *Id.*

As the plain language of Rule 26(g)(3) implies, "[t]he imposition of sanctions for a violation of Rule 26(g) is mandatory, although a court has discretion over '*which* sanction it must impose.'" *Kara Holding*, 2004 WL 1811427, at *23 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51 (1991)) (emphasis in original); *accord Kosher Sports*, 2011 WL 3471508, at *7; *Kiobel*, 2009 WL 1810104, at *2. An appropriate sanction may be levied on "the certifying attorney, the client, or both." *Kosher Sports*, 2011 WL 3471508, at *7; *see Nycomed*, 2010 WL 3173785, at *3.

However, sanctions under Rule 26(g)(3) may not be imposed unless the certification violates Rule 26(g)(1) "without substantial justification." Fed. R. Civ. P. 26(g)(3). As in the Rule 37(c) context, substantial justification does not mean "justified to a high degree, but rather has been said to be satisfied if there is a genuine dispute or if reasonable people could differ'" regarding the appropriateness of the conduct at issue." *Kosher Sports*, 2011 WL 3471508, at *11 (discussing the meaning of "substantial justification" in the context of Rule 26(g)) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)) (internal quotation marks and alterations omitted). Moreover, Rule 26(g)(3) permits sanctions, including reasonable attorneys' fees, "caused by the violation" of the Rule. *Id.* Accordingly, courts have interpreted Rule 26(g)(3) as incorporating a requirement that there be harm resulting from the alleged violation of the Rule. *See Kara Holding*, 2004 WL 1811427, at *23 ("'[S]anctions under Rule 26(g) are not appropriate when a party has not been harmed by the failure of his adversary.'" (quoting *Clark v.*

*Westchester County*, 96-CV-8381, 1998 WL 709834, at *9 (S.D.N.Y. Oct. 9, 1998) (alteration

omitted)); *accord Singer v. Covista, Inc.*, No. CIV.A. 10-6147, 2013 WL 1314593, at *9 (D.N.J.

Mar. 28, 2013) ("[L]ike Rule 37, the Court cannot impose sanctions pursuant to Rule 26(g) if it

finds that the non-compliant party's failure was substantially justified or harmless.") (citing

*Winner v. Etkin & Co.*, No. 07-CV-903, 2008 WL 5429623, at *5 (W.D. Pa. Dec. 31, 2008)).

The burden of demonstrating harmlessness is on the party opposing sanctions. *Kara Holding*,

2004 WL 1811427, at *24.

### 2. *Application as to MAR*

Based on the record compiled during the hearing, the Court concludes that MAR violated

its discovery obligations under Rule 26(a) and Rule 26(g)(1) by failing to disclose the Original

Report and email communications between George Maul and Mrs. Markey.[5]  Attorney Sirotkin

---

[5]     Lapolla argues that MAR also violated Rule 26(e) by failing to supplement Plaintiffs'
Initial Disclosures and discovery responses with the Original Report once MAR received a copy
of that document in October 2013.  *See* Lapolla Mot. ¶ 71; Lapolla's Post-Hrg. Brf. ¶ 37.
Rule 26(e) provides that a party must timely supplement or correct its initial Rule 26 disclosures,
and its responses to interrogatories and document demands "in a timely manner if the party
learns that in some material respect the disclosure or response is incomplete or incorrect, and *if
the additional or corrective information has not otherwise been made known to the other
parties during the discovery process* or in writing." Fed. R. Civ. P. 26(e)(1)(A) (emphasis
supplied). Here, Lapolla received the Original Report on October 7, 2013 in response to the
subpoena served on Insight Environmental.  *See* Subpoena, Hrg. Ex. 31.  Lapolla thereafter
provided a copy of the Original Report to MAR.  *See* Sirotkin Test., 4/6/15 Tr., at 347:9-348:6.
Attorneys Sirotkin and Ratner credibly testified at the hearing that Plaintiffs did not previously
provide the Original Report to MAR and that MAR only received that report when Lapolla did –
and even then, MAR did not realize that the information in that document was different from that
in the Revised Report.  Sirotkin Test., 4/6/15 Tr., at. 365:15-17; Ratner Test, 4/17/15 Tr., at
455:2-9.  The Court recognizes that the reason MAR found itself in this predicament was on
account of its own failure to properly supervise discovery with the Markeys.  Nevertheless, the
Court concludes that MAR's duty to supplement under Rule 26(e) was not triggered by its
receipt of the Original Report because that document had already been provided to Lapolla by the
time MAR should have learned that Plaintiffs had failed to include that document in their
Initial Disclosures and discovery responses.  The Court therefore concludes that MAR has not
violated Rule 26(e) and that provision therefore does not provide a valid basis to impose
sanctions.

signed the certification for Plaintiffs' Rule 26(a) Initial Disclosures and their responses to Lapolla's document requests.  *See* Hrg. Exs. 24 & 28.  Attorney Ratner also testified that, although he did not communicate directly with the Markeys, he supervised the discovery process.  *See* Ratner Test., 4/17/15 Tr., at 444:19-21, 445:4-14.  Under Rule 26(a), Plaintiffs' Initial Disclosures should have been based on all information which was "reasonably available" to Attorney Sirotkin and MAR after they had "fully investigated the case."  Fed. R. Civ. P. 26(a)(1)(E).  Moreover, pursuant to Rule 26(g), Attorney Sirotkin's signature on the Initial Disclosures and discovery responses "certifi[ed] that to the best of [his] knowledge, information, and belief formed after a reasonable inquiry," that the disclosures and responses were, *inter alia*, complete, correct, and consistent with the discovery rules.  Fed. R. Civ. P. 26(g)(1).

It is undisputed, however, that neither the Initial Disclosures nor the discovery responses were, in fact, complete because they did not include the Original Report or the relevant emails which were in Plaintiffs' possession.  The Court finds that these documents were "reasonably available" prior to the filing of the Initial Disclosures and therefore should have been disclosed pursuant to Rule 26(a).  *See* Fed. R. Civ. P. 26(a)(1)(E).

Moreover, the evidence adduced during the hearing demonstrates that neither Attorney Sirotkin nor anyone at MAR made a "reasonable inquiry" to determine what documents and other discovery Plaintiffs possessed before certifying that the Initial Disclosures were complete.  *See id.* at 26(g)(1).  According to the record, Attorney Sirotkin sent Plaintiffs one email prior to serving the Initial Disclosures, in which he requested that Plaintiffs provide, *inter alia*, air quality test results and write-ups.  *See* Sirotkin Feb. 18, 2013 Email, Hrg. Ex. 23.  However, Attorney Sirotkin mentioned in the same email that he had "already been sent a number of documents from Vince [Pravato] so don't feel as though you need to send us everything you have."  *Id.*

Sirotkin testified that, in essence, he intended that comment to be a directive to the Markeys to send any additional documents which they had not already sent to the Pravato Firm. *See* Sirotkin Test., 4/6/15 Tr., 336:9-13. But there is no evidence that Attorney Sirotkin ever reviewed with Plaintiffs what documents he had received from the Pravato Firm, or that he made further efforts to communicate with the Markeys about their document production prior to filing the Initial Disclosures on May 3, 2013 – or that he ever sat down with the Markeys to go through the documents and materials they had. Mrs. Markey also testified that neither the Pravato Firm nor MAR ever asked her to identify or produce emails she exchanged with George Maul. Mrs. Markey Test., 3/23/15 Tr., at 26:7-9; 34:23. While an attorney may, when appropriate, rely on the representations "by her client or by other attorneys" when conducting the "reasonable inquiry" under Rule 26(g)(1), *Kiobel*, 2009 WL 1810104, at *2, the Court finds it was not reasonable for MAR to simply assume, without any substantive inquiry by MAR, that the documents it received from the Pravato Firm and the Plaintiffs encompassed all the documents Plaintiffs were required to disclose under Rule 26(a). Rather, MAR was required to conduct a more thorough investigation of the discovery in Plaintiffs' possession prior to serving the Initial Disclosures.

The Court finds that MAR's inquiry was similarly lacking with respect to its certification of Plaintiffs' responses to Lapolla's request for production. In particular, the evidence compiled at the hearing shows that Attorney Sirotkin and Attorney Ratner failed to adequately oversee Plaintiff's document production, including the culling of relevant ESI. "'While, of course, it is true that counsel need not supervise every step of the document production process and may rely on their clients in some respects, counsel is responsible for coordinating her client's discovery efforts[,] both in terms of the client's duty to locate relevant information and the client's duty to

preserve and timely produce that information.'" *Greene v. Netsmart Technologies, Inc.*, No. CV 08-4971, 2011 WL 2225004, at *8 (E.D.N.Y. Feb. 28, 2011) *report and recommendation adopted*, 2011 WL 2193399 (E.D.N.Y. June 2, 2011).  As previously discussed, Rule 26(g)(1) permits an attorney to rely on his or her client's representations where appropriate, but the attorney's pre-certification inquiry must still be a reasonable one.  *See Kiobel*, 2009 WL 1810104, at *2.

The *Greene* case provides a worthwhile analogy.  In *Greene*, a 2011 decision of the undersigned, the plaintiff did not turn over all documents that he had on his computer and their existence only became known at plaintiff's deposition.  2011 WL 2225004, at *5.  In an affidavit, plaintiff Greene stated that the documents "were not turned over because [he] either did not know [they] existed or did not think [they were] relevant." *Id.* at *8.  Plaintiff went on to state that although he destroyed certain handwritten notes or audio recordings, it was only after the information contained in those materials had been transferred to another source.  *Id.*  There was clearly a breakdown in the communication between plaintiff and his counsel regarding document preservation and collection.  This Court further noted that "[p]laintiff's counsel does not explain what efforts he employed to advise and gather documents from his client." *Id.* Finding that plaintiff and/or his counsel acted in a manner that meets the "ordinary negligence" standard, this Court recommended (and the district court upheld) monetary sanctions.  *Id.* at *9; 2011 WL 2193399, at *1.  In doing so, this Court stated that "it is not possible to know precisely whether the omissions here occurred due to plaintiff's failure to adequately produce documents or his counsel's failure to sufficiently oversee the document retention and collection.  *Greene*, 2011 WL 2225004, at *9.  As a result, the plaintiff was directed to pay 50% of the costs and fees involved while counsel was required to pay the other 50%.  *Id.*; *see also Zubulake v. UBS*

*Warburg LLC,* 229 F.R.D. 422, 432 (S.D.N.Y.  2004) ("discovery obligations do not end with the implementation of a 'litigation hold' – to the contrary, that's only the beginning.  Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant" evidence); *Pension Committee of the Univ. Of Montreal Pension Plan v. Banc of Am. Sec. L.L.C.* 685 F. Supp. 2d 456, 477 (S.D.N.Y.  2010) (a party's "fail[ure] to execute a comprehensive search for documents and/or fail[ure] to sufficiently supervise or monitor [ ] document collection was "best characterized as either grossly negligent or negligent); *Phoenix Four, Inc. v. Strategic Resources Corp.*, No. 05 CV 4837, 2006 WL 1309413, at \*5-6 (S.D.N.Y. May 23, 2006) (underscoring counsel's affirmative duty to ensure that all sources of relevant information are discovered).

Here, the record reveals that, although Attorney Sirotkin signed Plaintiffs' discovery responses and Attorney Ratner purportedly oversaw discovery in Plaintiffs' case, the attorneys had little to no direct contact with Plaintiffs during the process of gathering the responsive documents.  Instead, discovery was conducted primarily between the Markeys and Attorney Sirotkin's paralegal, Greg Shuster.  *See* Mrs. Markey Test., 4/6/15 Tr., 213:16-21; 223:24-224:2; Shuster Emails, Markey Aff., Hrg. Ex. 5.  Moreover, Mr. and Mrs. Markey both credibly testified that no one at MAR (including Shuster) ever reviewed Lapolla's specific discovery requests with them, or explained to Plaintiffs what kind of documents or information would be responsive to each request.  *See* Mrs. Markey Test., 4/6/15 Tr., at 213:22-214:4, 16-20; 215:13-216:17; Mr. Markey Test., 4/17/15 Tr., at 420:18-421:1.  Mrs. Markey also testified that, while paper discovery was being gathered, MAR did not tell her that email communications were "discoverable."  Mrs. Markey Test., 3/23/15 Tr., 26:6-9; 34:21-23, 36:24-37:3.  Indeed, it was not until after some of Mrs. Markey's emails were disclosed during Maul's deposition that Greg

Shuster first inquired whether the Markeys possessed these or additional emails.  *See* Shuster

Email dated Apr. 24, 2014, Hrg. Ex. 34.  Finally, Attorney Sirotkin admitted that he never

conducted a search of Mrs. Markey's email account even though some documents Plaintiffs

produced appeared to have been printed from Mrs. Markey's email.  Sirotkin Test., 4/6/15 Tr., at

343:1-14.

Attorney Sirotkin and Attorney Ratner made clear at the hearing that, in their view,

MAR's conduct during discovery was sufficient given that the Markeys "were relatively

sophisticated and relatively involved clients."  Ratner Test., 4/17/15 Tr., at 449:13-17; *see*

Sirotkin Test., 4/6/15 Tr., at 344:19-23, 345:7-10.  On the other hand, the Markeys made equally

clear that, despite their alleged savvy and involvement in this litigation, they did not fully

understand what documents and ESI they needed to provide to their attorneys.  For instance, the

Court finds that Mrs. Markey's "conscious decision" not to provide the Pravato Firm and MAR

with a copy of the Original Report stemmed not from her desire to conceal that document, but

rather from her lay person's lack of understanding how it could be relevant and why it should be

disclosed.  Such a misunderstanding could have been avoided if MAR's attorneys had been

diligent in complying with their discovery obligations.  *See Greene*, 2011 WL 225004, at *9;

*Pension Committee*, 685 F. Supp. 2d at 477.  Ultimately, the Court does not find that either the

Markeys or MAR deliberately withheld any of the documents at issue here.  And, as noted, the

Court is cognizant that, under Rule 26(g)(1), MAR was permitted to rely on the Markeys'

representations to some extent.  However, the degree to which MAR relied on their clients'

representations and alleged savvy here was inappropriate.  Accordingly, in light of the foregoing

evidence and based on the totality of the circumstances, the Court concludes that Attorney

Sirotkin's certifications of Plaintiffs' Initial Disclosures and discovery responses were improper

because they were not the result of due diligence on counsel's part and not made after

"reasonable inquiry" by counsel, in violation Rule 26(g)(1).  *See generally Quinby*, 2005 WL

3453908, at *4.

Having determined that MAR's conduct violated Rule 26(a) and 26(g)(1), the Court must

next decide whether MAR's violations warrant sanctions under Rule 37(c) and Rule 26(g)(3).

Primarily, the Court finds that Lapolla has carried its burden with respect to the three elements of

a Rule 37(c)(1) motion for sanctions based on the failure to disclose.  *See generally In re Sept.*

*11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 124-25.  First, as already noted, the evidence

presented at the hearing demonstrates that MAR breached its obligations pursuant to Rule 26(a)

and Rule 26(g)(1) by failing to disclose the Original Report and the relevant emails.  *See*

*generally In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125.

Second, MAR acted with the requisite culpable state of mind.  Although Lapolla asserts

that MAR intentionally withheld the Original Report and emails, *see* Lapolla's Post-Hrg. Brf. at

18 ¶ C, the Court credits Sirotkin and Ratner's testimony that MAR's failure to produce those

documents was not intentional.  *See* Ratner Test, 4/17/15 Tr., at 455:2-9.  Moreover, Lapolla has

not pointed to any evidence which rebuts that finding.  Having considered all of the facts, the

Court concludes that, on the "continuum of fault ranging from innocence through the degrees of

negligence to intentionality" in determining a culpable state of mind, *Reilly*, 181 F.3d at 267,

MAR's conduct falls on the spectrum somewhere between negligence and gross negligence,

closer to the former than the latter.  *See generally F.D.I.C. v. Horn*, No. CV 12-5958, 2015 WL

1529824, at *13 (E.D.N.Y. Mar. 31, 2015).  MAR did not produce the Original Report and

relevant emails in a timely manner on account of its failure, *inter alia*, to adequately investigate

the discovery that was in Plaintiffs' possession, to review the document requests with Plaintiffs

themselves, and to diligently supervise Plaintiffs' production.  As such, counsel acted in manner that at least meets the "ordinary negligence" standard.  *See Greene*, 2011 WL 2225004, at \*8 (imposing monetary sanctions where the plaintiff "failed to produce relevant documents in a timely manner and . . .  failed to preserve all relevant documents and recordings" because of "a breakdown in communication between Plaintiff and his counsel regarding document preservation and collection").  The fact that counsel may have engaged in discovery in good faith does not, however, absolve its culpable conduct "because the relevant state of mind for sanctions under Rule 37(c) is 'ordinary negligence,' not intentional conduct."  *Fossil*, 302 F.R.D. at 293.

   Third, the Court concludes that the Original Report and the emails between George Maul and Mrs. Markey were relevant to Lapolla's case.  MAR argues that Lapolla's position on relevance is inconsistent because, on the one hand, "Lapolla discounts the opinions given by Mr. Maul in his final report," and on the other hand, "Lapolla purports that Mr. Maul's original report is some type of 'smoking gun' document that . . . . was very damaging to Plaintiffs' case." MAR Post-Hrg. Brf. at 5.  The Court finds this argument unavailing.  Throughout this litigation, Lapolla has disputed the claim that its SPF caused or proximately caused Plaintiffs' injuries.  *See* LaPolla Answer to SAC at 22 (Twenty-Third Affirmative Defense) [DE 30].  Considering the contents of the two Maul reports, as well as the evidence presented at the hearing, the Court finds that the Original Report presents conclusions which are favorable to Lapolla's defenses, particularly when compared to the conclusions set forth in the Revised Report.  This fact remains true whether or not Lapolla ultimately disputed the conclusions George Maul reached in either report.  The Court further finds that Lapolla was entitled to discover the emails showing that Mrs. Markey asked George Maul to revise the Original Report and to make the changes reflected in the Revised Report.  The Court is aware that, as MAR asserts in its brief, Plaintiffs did not

intend to use Maul as an expert or to rely on either the Original Report or the Revised Report to advance Plaintiffs' claims at trial or on summary judgment.  *See* MAR Post-Hrg. Brf. at 5.  In the end, that contention carries little weight in the context of this motion.  While Lapolla should not be awarded a "windfall for uncovering evidence that would have made little difference in the underlying case," *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125, the Court concludes that a reasonable trier of fact could find that the information in the non-disclosed documents supported Lapolla's defenses in this action.

Even where the foregoing factors have been met, courts may not impose sanctions under Rule 37(c)(1) or 26(g)(3) where the "failure to comply was substantially justified or where the conduct was harmless."  *Ritchie Risk*, 280 F.R.D. at 158-59 (internal quotation marks omitted); *see Kara Holding*, 2004 WL 1811427, at \*24 (noting that Rule 37(c)(1) and 26(g)(3) "both . . . excuse harmless discovery failures"); *accord Singer*, 2013 WL 1314593, at \*9 ("[L]ike Rule 37, the Court cannot impose sanctions pursuant to Rule 26(g) if it finds that the non-compliant party's failure was substantially justified or harmless.") (citing *Winner*, 2008 WL 5429623, at \*5 ("The imposition of sanctions under Rule 26(g) and/or Rule 37 is phrased in mandatory language unless the Court finds that the failure was substantially justified or harmless.")).  Here, MAR, as the party opposing sanctions, bears the burden of showing that its failure to disclose the documents at issue was substantially justified and/or harmless.  *See Kara Holding*, 2004 WL 1811427, at \*24; *Ritchie Risk*, 280 F.R.D. at 159.

MAR has not shown that its conduct was substantially justified.  In short, no "genuine dispute" exists that MAR was required to disclose the Original Report and emails in Plaintiffs' Initial Disclosures and discovery responses, which Attorney Sirotkin certified pursuant to the Federal Rules, and that MAR failed to make those disclosures.  *See Ritchie Risk*, 280 F.R.D. at

159.  The only excuse MAR proffers for its discovery failures is that it "was not aware of th[e original] report or the e-mail communications until Lapolla became aware of them."  MAR Opp. at 8; MAR Post-Hrg. Brf. at 4.  While the Court accepts MAR's asserted lack of awareness of the Original Report and emails, MAR's dilemma is one of its own making.  Its purported ignorance only serves to highlight its failure to perform its obligations with the necessary diligence required under Rule 26(g)(1)'s "reasonable inquiry" requirement.  By any stretch of the argument, MAR's assertion cannot be construed as substantially justifying itss failure to timely disclose those materials to Lapolla.

On the other hand, some argument can be made that MAR has met its burden, albeit marginally, to show that its failure to comply with its Rule 26 discovery obligations was harmless with respect to the Original Report.  The Court notes first that, according to Lapolla's own submissions, *see* Lapolla Mot. ¶ 70, Lapolla learned that Plaintiffs had failed to disclose the Original Report in October 2013 when it received a copy of that report pursuant to the subpoena served on Insight Environmental.  Yet, Lapolla did not bring this discovery violation to the Court's attention during the November 6, 2013 discovery status conference.  *See* DE 68.  Rather, Lapolla waited nine months to raise this issue for the first time in the instant motion for sanctions, which was filed on July 8, 2014.[6]  This information begs the question of how long Lapolla let sit the documents produced in response to the subpoena without reviewing the documents carefully.  Lapolla does not argue – and the record does not reflect – that discovery

---

[6]      The Court further notes that, in its status report submitted prior to the November 6, 2013 conference, Lapolla appears to have relied on the findings in Maul's Original Report to support its request for the Court to issue a *Lone Pine* Order.  *See* DE 57 at 3 ("From the records produced by the Markeys thus far, at least one of their indoor air quality consultants identified the claimed odor in their home as 'a nuisance odor' that 'should not negatively impact the health of anyone occupying the area.'").

efforts were hindered due to the untimely disclosure of the Original Report, or that Lapolla was required to undertake additional discovery on account of MAR's failure to provide that document. *Compare Fossil*, 302 F.R.D. at 291, 294 (awarding reasonable legal fees and costs incurred by the defendants in connection with the additional discovery the defendants were required to undertake, including reopening a deposition, due to plaintiff's untimely disclosure of certain documents, which plaintiff's counsel admitted would have been subject to exploration at the previous deposition); *Kosher Sports*, 2011 WL 3471508, at *14-15 (imposing monetary sanctions under Rule 26(g) and 37(c) where "the defense was constrained to reopen several depositions, likely at considerable expense" on account of the plaintiff's failure to disclose certain tapes); *Oceans Cuisine, Ltd. v. Fishery Products Int'l, Inc.*, No. 05–CV–3613, 2006 WL 1071578, at *6 (E.D.N.Y. Apr. 21, 2006) (approving, under Rule 37(c)(1), the imposition on the plaintiff of all reasonable legal fees and costs incurred by the defendants in connection with additional discovery, where the plaintiff had failed to timely disclose information required by Rule 26(a)).  Rather, Lapolla was in possession of the Original Report when it took Maul's deposition, and, according to Lapolla's submissions, it "planned to interrogate the Markeys about the altered report" had those depositions not been unexpectedly cancelled, *see* Lapolla Mot. ¶ 39. Accordingly, the Court concludes that, because there is no evidence of prejudice to Lapolla based on MAR's failure to disclose the Original Report, it would be inappropriate to sanction MAR on that basis.

Whether MAR should be sanctioned for its failure to produce the emails between Maul and Mrs. Markey presents a closer issue.  Unlike the Original Report, Lapolla did not receive the emails – or learn of MAR's failure to disclose them – until much later in the proceedings. Lapolla obtained some of the emails from Maul during his deposition on April 23, 2014, and the

remainder of the emails after his deposition, on April 25 and April 26, 2014.  Notably, the email

communications in which Mrs. Markey asked George Maul to change the Original Report were

not disclosed until *after* Maul's deposition; Lapolla was therefore unable to question Maul about

these documents at the time of his examination.  The Court finds this fact weighs in favor of

sanctions, even if Lapolla did not seek to re-open Maul's deposition once the emails were

produced.  The Court further notes that Lapolla did not have a reasonable opportunity to seek

Court intervention on the email issue since, just days after the emails were produced, MAR filed

its April 28, 2014 motion to withdraw as counsel, *see* DE 76, and the Court subsequently entered

an Order staying discovery on April 29, 2014, *see* DE 80.  Perhaps most importantly, there is

evidence in the record showing that MAR's failure to disclose the emails caused Lapolla to incur

additional and otherwise unnecessary attorneys' fees and expenses.  Specifically, the attorney

billing records submitted by Lapolla during the hearing indicate that its counsel, Hoover

Slovacek, billed Lapolla for the time counsel spent, *inter alia*, reviewing the emails it belatedly

received from Maul while preparing for the depositions of the Markeys.  *See* Affidavit of

Matthew Kornhauser ("Kornhauser Aff."), Hrg. Ex. 56.

Based on the foregoing analysis, the Court concludes that MAR's failure to produce the

emails between George Maul and Mrs. Markey warrants the imposition of monetary sanctions.

*See generally Fossil*, 302 F.R.D. at 294 (assessing "reasonable legal fees and costs incurred by

the Defendants in connection with the additional discovery" caused by the plaintiff's untimely

disclosure of relevant documents).  MAR's omissions and lack of diligence constitute egregious

conduct that must be rectified.  The Court will address the appropriate amount of sanctions after

it has discussed Lapolla's remaining requests for sanctions against Plaintiffs and MAR.

###### 3.      *Application as to Plaintiffs*

Lapolla also seeks to impose discovery sanctions against Plaintiffs based on their failure to disclose the Original Report and the emails.  Having considered the evidence adduced during the hearing as well as the parties' arguments, the Court finds that, although Plaintiffs should have provided these documents to their attorneys during the discovery process, their failure to do so was "substantially justified" by the lack of guidance and oversight of the attorneys representing them.  Although "the duty to preserve and produce documents rests on the party," *Greene*, 2011 WL 2225004, at *8 (internal quotation marks omitted), "[d]iscovery is run largely by attorneys, and the court and the judicial process depend upon honesty and fair dealing among attorneys." *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125.  This conclusion is brought home by the testimony of the Markeys, and Mrs. Markey in particular.  As previously noted, Mrs. Markey testified substantially about Plaintiffs' interaction with counsel, stating that, *inter alia*: (1) Plaintiffs emailed primarily with Attorney Sirotkin's paralegal, Greg Shuster, during the discovery process and never spoke to Attorney Sirotkin himself, *see* Mrs. Markey Test., 4/6/15 Tr., at 213:16-21, 2223:24-224:2; (2) counsel never told Plaintiffs that emails were discoverable and should be produced, *see* Mrs. Markey Test., 3/23/15 Tr., at 26:7-9, 34:23; and (3) counsel never reviewed Lapolla's discovery requests with Plaintiffs (or their responses to those requests), and never explained to Plaintiffs their overall discovery obligations, *see* Mrs. Markey Test., 4/6/15 Tr., at 214:16-20, 215:13-216:17.  In light of this testimony, as well as other evidence presented at the hearing, the Court concludes that the omissions here are properly attributable to MAR's failure to sufficiently oversee the document retention and collection, rather than Plaintiffs' failure to adequately produce documents.  *Compare Greene*, 2011 WL 2225004, at *9 (recommending that the costs and fees on sanctions motions "be paid 50% by Plaintiff and 50%

by Plaintiff's attorneys" where the record did not reveal whether the plaintiff or the plaintiff's attorney was more to blame for the failure to produce and retain documents).

For the foregoing reasons, the Court respectfully recommends to Judge Seybert that Lapolla's motion for the imposition of sanctions under Rule 37(c) and 26(g)(3) be GRANTED, as against MAR, and DENIED, as against Plaintiffs.

### B.     Sanctions Pursuant to 28 U.S.C. § 1927 and the Court's Inherent Power

Lapolla also seeks an award of sanctions pursuant to 28 U.S.C. § 1927 against MAR, and pursuant to the Court's inherent powers against MAR and the Markeys.  *See generally* Lapolla Mot. ¶¶ 74-79.  The Court will consider these requests in tandem because, as explained below, the legal standard for evaluating sanctions claims under § 1927 and the Court's inherent power are the same.

### 1.     *Legal Standards*

Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  The Second Circuit has repeatedly held that imposition of sanctions under § 1927 requires a showing that (1) the attorney's actions were "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose"; and (2) the attorney acted in bad faith.  *Johnson ex rel. United States v. Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 125–26 (2d Cir. 2011) (per curiam) (citing *Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009)); *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2d Cir. 2000) (quoting *United States v. International Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991)); *Schlaifer Nance & Co. v. Estate of*

*Warhol*, 194 F.3d 323, 336 (2d Cir. 1999); *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).

Courts also possess the "inherent power to sanction parties and their attorneys, a power born of the practical necessity that courts be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Chambers*, 501 U.S. at 43); *see Agee v. Paramount Commc'ns, Inc.*, 114 F.3d 395, 398 (2d Cir. 1997) (quoting *Sierra Club v. U.S. Army Corps of Engineers*, 776 F.2d 383, 390 (2d Cir. 1985) (overruled in part on other grounds). "Unlike sanctions brought under § 1927, sanctions brought under a court's inherent powers may be made against the losing party itself as well as the losing party's attorney." *McCune v. Rugged Entm't, LLC*, No. 08-CV-2677, 2010 WL 1189390, at *2 (E.D.N.Y. Mar. 29, 2010) (citing *Hudson Motors Partnership v. Crest Leasing Enters.*, 845 F. Supp. 969, 982 (E.D.N.Y. 1994)). "Similar to § 1927, an award of sanctions under the court's 'inherent power' requires . . . 'clear evidence that the challenged actions are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes.'" *Mahoney v. Yamaha Motor Corp. U.S.A.*, 290 F.R.D. 363, 367 (E.D.N.Y. 2013) (quoting *Oliveri*, 803 F.2d at 1272); *accord Gagasoules v. MBF Leasing LLC*, 286 F.R.D. 205, 216 (E.D.N.Y. 2012).

The Second Circuit has observed that, "[i]n practice, 'the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both.'" *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143-44 (2d Cir. 2012) (quoting *Oliveri*, 803 F.2d at 1273). Accordingly, "[c]ourts use the same standard for

evaluating a sanctions claim under either 28 U.S.C. § 1927 or the court's inherent power." *McCune*, 2010 WL 1189390, at *2; *accord Gelicity UK Ltd. v. Jell-E-Bath, Inc.*, No. 10-CV-5677, 2014 WL 1330938, at *4 (E.D.N.Y. Apr. 1, 2014); *Mahoney*, 290 F.R.D. at 367; *Gagasoules*, 286 F.R.D. at 216.

Before imposing a sanction under either § 1927 or its inherent power, "a court 'must find clear evidence that: (1) the offending party's claims were entirely without color, *and* (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay.'" *Gelicity*, 2014 WL 1330938, at *4 (quoting *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (citing *Enmon*, 675 F.3d at 143; *McCune*, 2010 WL 1189390, at *3) (emphasis in original); *accord Mahoney*, 290 F.R.D. at 367 (quoting *Revson*, 221 F.3d at 79); *Gagasoules*, 286 F.R.D. at 216. "'The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice.'" *Mahoney*, 290 F.R.D. at 367 (quoting *Sierra Club v. U.S. Army Corps of Engineers*, 776 F.2d 383, 390 (2d Cir. 1985)). In addition, "the factual findings supporting these two requisite prongs must contain a high degree of specificity." *Gelicity*, 2014 WL 1330938, at *4 (citing *Enmon*, 675 F.3d at 143); *see Mitra v. Global Fin. Corp.*, No. 09-CV-4387, 2010 WL 5095797, at *2 (E.D.N.Y. Oct. 6, 2010) *report and recommendation adopted*, 2010 WL 5099385 (E.D.N.Y. Dec. 8, 2010).

## 2.    *Application*

Here, Lapolla seeks to impose sanctions under § 1927 and the Court's inherent powers against MAR and the Markeys based on their (1) assertion of personal injury claims in the pleadings, (2) prosecution of those claims, and (3) ultimate withdrawal of the action.

a.    **Colorability**

For a claim to lack a colorable basis, it must be "utterly devoid of [a] legal or factual

basis." *Mahoney*, 290 F.R.D. at 367 (citation omitted).  Indeed, as courts have noted, "[t]he

threshold for colorability is low," and "[c]laims are deemed 'colorable' when, viewed in light of

the reasonable beliefs of the party making the claim, the claim has *some* amount of factual and

legal support." *McCune*, 2010 WL 1189390, at *4 (emphasis in original) (citing *Revson*, 221

F.3d at 78-79 (noting that to fail colorability element requires finding that "the offending party's

claims were entirely meritless")).  Here, Lapolla argues, in essence, that because there was no

medical evidence to support Plaintiffs' personal injury claims at the time those claims were

asserted in the pleadings, and because Plaintiffs testified that they did not authorize MAR to

bring personal injury claims on their behalf, the personal injury claims lacked colorability.

Having considered the pleadings and the evidence presented at the hearing, the Court is

unable to conclude that Plaintiffs' personal injury claims were entirely meritless.  Rather,

viewing the claims in light of reasonable beliefs held by MAR and Plaintiffs, the personal injury

claims "could be deemed to have some amount of factual and legal support." *McCune*, 2010 WL

1189390, at *4 (citing *Revson*, 221 F.3d at 78-79).  As noted in the Court's Findings of Fact, it is

undisputed that, at the time the pleadings were filed, neither MAR nor Plaintiffs possessed

medical evidence which connected the Plaintiffs' alleged injuries to Lapolla's SPF.  However, as

the court discussed in *McCune*, colorability may be established by showing that it was "possible"

for a reasonable attorney or party to conclude at the time the complaint was filed that "facts

supporting his [or her] claim . . . may later be established." *McCune*, 2010 WL 1189390, at *4

(citing *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980) ("The question is whether a

reasonable attorney could have concluded that facts supporting the claim might be established,

not whether such facts actually had been established."); *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 556 (2007) (noting, in the motion to dismiss context, that a well-pleaded complaint may

proceed to discovery even where "it strikes a savvy judge that actual proof of those facts is

improbable, and that a recovery is very remote and unlikely")).

This "possibility" standard has been satisfied here, particularly with respect to the

personal injury claims asserted on behalf of Mrs. Markey.  Attorney Sirotkin and Attorney

Ratner testified at the hearing that MAR asserted these claims based on their knowledge that

Mrs. Markey "w[as] suffering some very serious possible neurological problems" which she

attributed to her exposure to Lapolla's SPF.  Ratner Test., 4/17/15 Tr., at 456:19-21; s*ee* Sirotkin

Test., 4/615 Tr., at 367:22-368:2.  Mrs. Markey also made clear during the hearing that she

believed that Lapolla's SPF was making her sick, even if she did not have the medical evidence

to corroborate that belief at the time the pleadings were filed.  *See generally* Mrs. Markey Test.,

3/23/15, at 51:1; 4/6/15 Tr., at 197:6-8.  Accordingly, although Dr. Lee and Dr. Pourmmand did

not establish a connection between Mrs. Markey's alleged injuries and her exposure to SPF at the

time of the filing of the pleadings, the Court finds that a reasonable attorney or party could have

concluded that facts establishing causation "might later be established."  *McCune*, 2010 WL

1189390, at *4.

Moreover, the Court addressed the causation issue at the November 6, 2013 conference

with respect to Lapolla's request for a *Lone Pine* Order.  *See* DE 60 ¶ 6.  Specifically, the Court

ordered Plaintiffs to produce evidence from their "chemical specialist" showing a "link between

Mrs. Markey's medical issues and the subject spray foam."  *Id.*  If Plaintiffs had been unable to

do so, Plaintiffs would have been directed to "remove the allegations of personal injury in the

Complaint," as the Court noted during the conference.  *Id.*  Plaintiffs complied with the Court's

directive by producing an expert, Dr. Ziem, who diagnosed Mrs. Markey as suffering from various ailments which, in Dr. Ziem's view, were caused by Mrs. Markey's exposure to Lapolla's SPF.  *See* Dr. Ziem Report, Hrg. Ex. 34.  Accordingly, the Court concludes that Mrs. Markey's personal injury claims were colorable.

The coloarbility of the personal injury claims asserted on behalf of Mr. Markey present a narrower issue.  As discussed, Mr. Markey never sought treatment for any medical issues related to his exposure to SPF.  Indeed, Mr. Markey testified that he never even told the Pravato Firm that he had been personally injured, and they did not discuss any personal injury assertion at all.  Mr. Markey Test., 4/17/15 Tr., at 415:13-15.  However, Attorney Sirotkin and Attorney Ratner testified that, based on information they received from the Pravato Firm about the "discomfort" Mr. Markey was experiencing on account of the SPF, and MAR's general knowledge of SPF's potential adverse effects, the firm had "a good faith basis for asserting a personal injury case" on Mr. Markey's behalf.  *See* Ratner Test., 4/17/15 Tr., at 461:4; *see id.* at 444:4-6, 467:9-13; Sirotkin Test., 4/615 Tr., at 366:20-25; 367:22-368:2.  In light of this testimony which the Court deems credible, the Court concludes, by a narrow margin, that MAR had some "subjective belief in the merits of their case" for Mr. Markey's personal injury claim; therefore, that claim "cannot be deemed entirely colorless."  *McCune*, 2010 WL 1189390, at *4 (quoting *Schlaifer*, 194 F.3d at 340-41) (internal quotation marks omitted)).

For these reasons, the Court concludes that Lapolla has failed to meet its burden of showing that Plaintiffs' personal injury claims were not colorable.

### b.    Bad Faith

"In the context of a sanctions analysis under either section 1927 or a court's inherent powers, the element of bad faith is 'restrictively' interpreted.'"  *Gelicity*, 2014 WL 1330938, at

*6 (quoting *McCune*, 2010 WL 1189390, at *3) (internal quotation marks omitted).  "For a finding of bad faith, . . . a court must: (i) find that the challenged actions were taken for improper purposes, such as harassment or delay; and (ii) provide a high degree of specificity in the factual findings."  *McCune*, 2010 WL 1189390, at *3 (citing *Oliveri*, 803 F.2d at 1272).  "Thus, in this Circuit, the bad faith standard is not easily satisfied and sanctions are warranted only in extreme cases."  *Id.* at *4 (citing *Revson*, 221 F.3d at 77-78 (reversing trial court's award of sanctions despite conduct by counsel including: (i) sending letter to defendant attorney Cinque threatening to tarnish his reputation; (ii) publicly accusing Cinque of fraud without any concrete evidence to support the claim; (iii) threatening to send a letter to the court accusing Cinque of criminal conduct if he did not capitulate to [the plaintiff's] demands; and (iv) repeatedly attacking Cinque in an offensive and demeaning fashion) (internal citations and quotations omitted); *60 E. 80th St. Equities, Inc. v. Sapir (In re 60 E. 80th St. Equities)*, 218 F.3d 109, 115-17 (2d Cir. 2000) (imposing sanctions when the party in the prior bankruptcy proceedings "clearly lacked standing," then appealed the decision of the Bankruptcy Court despite that court's warning that such an appeal was meritless, and then, on appeal before the District Court, made claims having "absolutely nothing to do with the merits of his case" and "disparaged and made unsubstantiated allegations impugning the integrity of the Bankruptcy Court"); *Oliveri*, 803 F.2d at 1276-78 (imposition of sanctions reversed and no bad faith found despite District Court's holding that the Plaintiff was "unworthy of belief and [that] his testimony was incredible") (internal quotations omitted)).  "Indeed, even if the motives of a party or attorney are questionable, a court may nevertheless decline to find bad faith."  *Gelicity*, 2014 WL 1330938, at *6; *see also Arthur the Dog v. U.S. Merchandise, Inc.*, No. 05–CV–958, 2007 WL 2493427, at *11 (E.D.N.Y. Aug. 29,

2007) (despite some indicia of bad faith by attorney, court refused to find bad faith, where same attorney made other efforts to avoid protracted litigation).

Based on evidence in the record here, the Court "cannot find with the required high degree of factual specificity" that the decisions made and the actions taken by MAR and Plaintiffs in this case "were so completely without merit as to require the conclusion that [they] must have been undertaken for some improper purpose such as delay' giving rise to an inference of bad faith." *McCune*, 2010 WL 1189390, at *5 (quoting *Oliveri*, 803 F.2d at 1273). First, to the extent that Lapolla suggests Plaintiffs and MAR acted in bad faith based on their failure to disclose the Original Report and relevant emails, the Court has already determined that this conduct does not rise to the level of bad faith. Next, the Court finds "no clear evidence" that either Plaintiffs or MAR acted in bad faith in filing the pleadings in this action or proceeding with the litigation. *See Mahoney*, 290 F.R.D. at 369. Lapolla points to the Markeys' testimony that MAR filed personal injury claims on their behalf without their consent as supporting a finding of bad faith. *See* Lapolla Post-Hrg. Brf. ¶¶ 13, 15; *see, e.g.*, Mrs. Markey Test., 4/6/15 Tr. at 158:12-23, 170:18-171:5; Mr. Markey Test., 4/17/15 Tr., at 414:4-7, 415:13-20. However, as previously discussed, the Court concludes that Plaintiffs' personal injury claims were not entirely colorless either when they were asserted in the pleadings or as the litigation progressed. *See McCune*, 2010 WL 1189390, at *5. Thus, even if MAR did assert personal injury claims without Plaintiffs' consent, the Court cannot infer that MAR did so in bad faith, particularly in light of the credible testimony of Attorneys Ratner and Sirotkin that MAR had a good-faith basis to assert these claims. *See* Ratner Test., 4/17/15 Tr., at 456:19-21, 459:16-21, 461:2-5, 465:91-13; Sirotkin Test., 4/615 Tr., at 366:20-25; 367:22-368:2. And even if Plaintiffs' personal injury claims did lack merit, "this Circuit has explicitly held it improper to determine that a party acted

in bad faith if that party filed a meritless claim." *Mahoney*, 290 F.R.D. at 370 (citing *Eisemann*, 204 F.3d at 397).

The Court also notes that, in addition to personal injury, Plaintiffs sought to recover for property damage in this action – a fact that Lapolla neglects to acknowledge in its submissions on this motion. Without engaging in an assessment of the merits of that claim – an area not addressed by the parties during the hearing – the Court finds that Plaintiffs and MAR, at the very least, made efforts to support their claim for property damage by, *inter alia*, disclosing the lab reports by Matrix and retaining Bernie Bloom as an expert. Thus, the Court has no basis to conclude that any of the claims asserted in this litigation were brought or maintained in bad faith.

The Court also finds no basis for a finding of bad faith based on Plaintiffs' voluntary withdrawal of their claims in this action. To the contrary, the record suggests that Plaintiffs proceeded in good faith. Mrs. Markey credibly testified that MAR's motion to withdraw as counsel came as an unpleasant and unanticipated surprise, *see* Mrs. Markey Test., 4/6/15 Tr., at 204:24, presumably because Plaintiffs had otherwise planned to proceed with the litigation. However, Plaintiffs nevertheless permitted MAR to withdraw as counsel. *See id.* at 308:2-14. Judge Seybert thereafter granted MAR's motion to withdraw and Plaintiffs, "[r]ather than vexatiously seeking to delay the proceedings," retained new counsel in compliance with Judge Seybert's Order and "moved promptly to voluntarily dismiss the action with prejudice." *McCune*, 2010 WL 1189390, at *5. Further, the Court finds no basis to conclude that Plaintiffs had any "ulterior motive" for withdrawing their claims other than their inability to find new counsel to represent them in this litigation. *See* Markey Aff., Hrg. Ex. 5, ¶ 63.

Finally, the Court finds no evidence that MAR acted in bad faith by withdrawing as Plaintiffs' counsel. Primarily, the Court notes that Judge Seybert granted the motion to withdraw

after conducting a hearing, a portion of which this Court assumes was done *in camera*.  The

reasons for that decision have no bearing on this Court's analysis.  Nevertheless, the ultimate

conclusion that Lapolla would have the Court reach is that MAR's withdrawal as counsel was

motivated by its sudden and belated realization – brought on by the deposition testimony of Dr.

Lee and Dr. Pourmand, as well as revelation of the Original Report and emails, among other

things – that Plaintiffs' claims were frivolous and no longer worth pursuing.  The Court declines

to draw such an inference based on the current record.  Attorney Ratner specifically testified that

MAR did not withdraw because the Markeys' case was "frivolous."  Ratner Test., 4/17/15 Tr., at

559:12-14.  Rather, Attorney Ratner testified that MAR and the Markeys reached a "fundamental

disagreement" as to whether the litigation should continue in light of a variety of circumstances,

*see id.* at 558:18-559:8 – including the unexpected illness of Plaintiffs' expert, Bernie Bloom,

*see id.* at 562:21-563:1 – all of which raised concerns about the "ongoing costs of the litigation"

and MAR's available resources as a "contingency fee firm."  *Id.* at 563:6-15.  While the Court

does not find every explanation provided by Attorney Ratner to be particularly compelling, "the

bar for awarding sanctions pursuant to § 1927 and the Court's inherent power is an exacting

one."  *Gagasoules*, 286 F.R.D. at 219.  Ultimately, Attorney Ratner provided some valid reasons

for MAR's withdrawal as counsel, and Lapolla has not pointed to any evidence from which the

Court can infer that MAR's decision to withdraw as counsel was made in bad faith.  The Court

recognizes, as it did during the April 29, 2014 telephone conference immediately following the

filing of MAR's motion, that the timing of the motion appears suspect on its face.  *See* DE 80.

Ultimately, however, even if MAR "engaged in a misguided use of the legal process" by moving

to withdraw at the time and under the circumstances in which it did here, "the Court cannot say

that [it] abused the legal process."  *Gagasoules*, 286 F.R.D. at 219 (declining to impose § 1927

sanctions based on the plaintiffs' withdrawal of their motion to amend) (citing *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170 (2d Cir. 2012)).

Accordingly, the Court respectfully recommends to Judge Seybert that Lapolla's request to impose sanctions against MAR and Plaintiffs under § 1927 and the Court's inherent power be DENIED.

### C.    Sanction to Be Imposed

The Court must now consider the amount of sanctions to be imposed on MAR.  A major consideration in choosing an appropriate monetary sanction "is to restore the movant to the position that she would have been in had the wrongdoer faithfully discharged its discovery obligations.'"  *Greene*, 2011 WL 2225004, at *9 (quoting *Zubulake V*, 229 F.R.D. at 437) (internal alterations omitted).  Ultimately, the Court has "broad discretion in fashioning an appropriate sanction."  *Fossil*, 302 F.R.D. at 293.

Here, Lapolla seeks over $800,000 in sanctions for attorneys' fees and costs expended in defending this entire action, plus the fees and costs incurred in connection with the instant motion.  *See* Defendant Lapolla's First Supplement To Memorandum Of Law In Support Of Motion For Sanctions ¶¶ 1-3 [DE 92].  However, the Court has concluded that sanctions against MAR are only warranted as to its failure to exercise due diligence and comply with its obligations in the discovery process.  Based on the evidence and the circumstances presented here, the Court recommends that sanctions be assessed against MAR for reasonable legal fees and costs incurred by Lapolla in connection with its review of the emails between George Maul and Mrs. Markey in preparation for the Markeys' depositions.  The Court further recommends that Lapolla be awarded the costs and attorneys' fees related to bringing this motion.

The Court currently has before it the testimony from Lapolla's attorney, Attorney Kornhauser, concerning the amount of sanctions Lapolla seeks to recover based on its defense of Plaintiffs' action, *see generally* Hearing Testimony of Matthew Kornhauser, 4/17/15 Tr., at 514-537, as well as Attorney Kornhauser's affidavit, which includes attorney billing records from November 2012 to February 2015 for the three law firms which have represented Lapolla during this litigation: Baker & Hostetler LLP, Greenbaum Rowe Smith & Davic, LLP, and Hoover Slovacek, *see* Hrg Ex. 56.  The attorney billing records indicate that Hoover Slovacek billed $1,020 in connection with reviewing the referenced emails.  *See* Hrg. Ex. 56.  However, the attorney billing records do not appear to include the attorneys' fees and costs counsel incurred in connection with filing the instant motion.  Moreover, although counsel for MAR and counsel for Plaintiffs questioned Attorney Kornhauser during the hearing about the billing records to a limited extent, as the Court recognized at the conclusion of the hearing, counsel were not able to undertake a line-by-line review of the billing records with Attorney Kornhauser.  *See* 4/17/15 Tr., at 569:16-17 ("I know you didn't have an opportunity to go page by page through the billing records . . . ").

Accordingly, based on the totality of the circumstance presented here and the Court's recommended disposition of Lapolla's motion, the Court recommends that the final amount of sanctions to be imposed be DEFERRED and that Lapolla be permitted to make a fee application for its reasonable legal fees and costs incurred in connection with the additional discovery described above, as well as the fees and costs incurred in drafting the motion for sanctions as well as Lapolla's post-hearing brief – but not for the time incurred at the hearing since that time was directed by the Court.  The Court further recommends that Lapolla be given a maximum of thirty (30) days to make its fee application and that MAR be given equal time to oppose the fee

application.  The Court makes these recommendations with the understanding that Lapolla was not entirely successful on its sanctions motion and, as such, its fee application should be directed to the relevant legal fees and costs.

## V.   CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Seybert that Lapolla's motion for sanctions be GRANTED, in part, and DENIED, and in part.  Specifically, the Court recommends that the motion be GRANTED to the extent that sanctions be imposed against MAR pursuant to Rule 37(c) and 26(g)(3) for its failure to exercise due diligence and to comply with its discovery obligations, and that Lapolla be awarded its reasonable legal fees and costs incurred in connection with (1) the additional discovery necessitated by MAR's discovery violations, and (2) bringing the instant sanctions motion, to the extent set forth in this Report and Recommendation.  The Court recommends that the motion be DENIED in all other respects. The Court further recommends that the amount of sanctions awarded to Lapolla be DEFERRED and that Lapolla be permitted to make the appropriate fee application within thirty (30) days.

## VI.   OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Such objections shall be filed with the Clerk of the Court via ECF.  A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Joana Seybert, and to the Chambers of the undersigned.  Any requests for an extension of time for filing objections must be directed to Judge Seybert prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*,

118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*,

84 F.3d 52, 60 (2d Cir. 1996)


**SO ORDERED.**

Dated: Central Islip, New York
          August 25, 2015


                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge